# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

C.R. and J.R., individually and as
Next Friends of JOE R., a minor,

                Plaintiffs,

    v.                         Case No. 14-14531
                                HON. TERRENCE G. BERG
NOVI COMMUNITY SCHOOL      HON. R. STEVEN WHALEN
DISTRICT, et al.,

                Defendants.

_____/

## CONSOLIDATED ORDER RESOLVING CROSS-MOTIONS FOR SUMMARY JUDGMENT (Dkts. 78, 79, 83, 84)

This case is before the Court because one special-needs middle school student, "J.J.," allegedly sexually abused his classmate, "Joe R.," also a male special-needs student, while a third boy recorded the incident on his cell-phone. The response of the school district, teachers and administrators, as well as their conduct preceding the incident, caused Joe R.'s parents to file this lawsuit on his behalf.

Plaintiffs—Joe R., his mother J.R. and his father C.R.—filed an eleven-count Amended Complaint bringing claims against two Novi Middle School (NMS) administrators, an NMS teacher, an NMS substitute teacher and her staffing agency employer and the Novi Community School District (NCSD) and its Superintendent under Title 20 U.S.C. § 1681, Title 42 U.S.C. § 1983, Title 42 U.S.C. § 12101 and several Michigan state statutes and common law causes of action. (Dkt. 12).

Before the Court are cross-motions for summary judgment by both Defendants and Plaintiffs. Defendants NCSD's Superintendent Steven Matthews, NMS Principal Stephanie Schriner, NMS Assistant Principal Andrew Comb, NMS math teacher Vera Williams (Dkt. 83); NCSD (Dkt. 84); and Jean Solomon, a substitute teacher, and EDUStaff, LLC, her employer staffing agency (Dkt. 78) are all seeking summary judgment on all of Plaintiffs' claims against them.  Plaintiffs are seeking summary judgment on two of their claims. (Dkt. 79). On October 17, 2016, the Court heard oral argument on all four motions in Flint, Michigan.

For the reasons stated below, the Court will GRANT IN PART AND DENY IN PART Novi Community School District's motion for summary judgment (Dkt. 84), GRANT IN PART AND DENY IN PART Andrew Comb, Steven Matthews, Stephanie Schriner and Vera Williams's motion for summary judgment (Dkt. 83), DENY Plaintiffs' motion for summary judgment (Dkt. 79), and GRANT IN PART AND DENY IN PART Jean Solomon and EDUStaff's motion for summary judgment. (Dkt. 78).

## I.    Background

### *NCSD and NMS Student Behavior Policies*

In 2011, the U.S. Department of Education sent a letter apprising federal funding recipients, including NCSD, of the need to train school staff on recognizing sexual harassment and their responsibilities to prevent and respond to it under Title IX, 20 U.S.C. § 1681. (Dkt. 79, Ex. 4). According to NCSD policy,

Superintendent Steven Matthews had a duty to oversee this training. (Dkt. 79, Ex. 1 at 15).[1] Matthews testified that he is unsure whether NMS staff received such training during the 2013-14 school year—*i.e.* the year J.J.'s alleged harassment of Joe R. took place. (Dkt. 79, Ex. 1 at 15). According to NMS Principal Stephanie Schriner, as of 2013 NMS had not offered its staff any training on sexual abuse protocol, but the faculty had discussed the topic "informally." (Dkt. 79, Ex. 2 at 28).

In addition to NCSD's responsibilities under Title IX, the school district's internal policy requires the Superintendent to promulgate administrative guidelines for providing intervention when students show warning signs of troubling behaviors. (Dkt. 79, Ex. 1 at 29-30; Ex. 7). Superintendent Matthews testified, however, that he had never promulgated such guidelines and did not know whether his district has any. (*Id.*). Matthews further stated that he believed NCSD has a system for transitioning students that teachers believe to be dangerous between the elementary and middle schools, but added that he was unaware of the system's details because individual school principals administered it. (*Id.* at 30-32). Principal Schriner, however, testified that NMS has no such transition system. (Dkt. 79, Ex. 2 at 16). In addition, Assistant Principal Comb, in charge of discipline at NMS, testified that it was the school's practice *not* to check incoming or current students' past behavioral records. When asked whether he told Joe R.'s parents

---

[1] To promote ease of reference, in this Order citations to page numbers in depositions refer to the page numbers printed on the depositions, which contain four smaller pages on each page of the electronic document. In all other materials, citations to page numbers refer to the page numbers (but not the Page ID) that the Case Management/Electronic Case Filing system assigns, which appear at the top of each page of the electronic document.

that he gave all students a "clean slate," Mr. Comb acknowledged that he may have said something like that, and added, "we don't go dig into what a student may have done at a school before our school." (Dkt. 79, Ex. 3 at 97-98).

*J.J.'s Alleged Harassment of Joe R.*

Plaintiffs allege that in or about September 2013, J.J. began sexually harassing Joe R. (Dkt. 12 at 5). At that time, each boy was either twelve or thirteen years old,[2] in seventh grade and received special education services. (*Id.* at 2, 4; Dkt. 79 at 25). Joe R. qualified for special education support under the eligibility category of Autism Spectrum Disorder. (Dkt. 79, Ex. 10 at 4).[3] J.J. qualified for special education programming under the eligibility category of Emotionally

---

[2] The only reference in the record to both J.J.'s and Joe R.'s ages at the time of the alleged harassment appears in Plaintiffs' motion for summary judgment, where it states that the boys were "12-13" years old during the 2013-14 school year. (Dkt. 79). Plaintiffs' amended complaint, filed on December 22, 2014 states, "Joe R. is currently 13 years old." The Court thus does not know exactly how old each boy was in September 2013.

[3] The American Psychiatric Association's Diagnostic and Statistical Manual lists Diagnostic Criteria for Autism Spectrum disorder as including persistent deficits in: social-emotional reciprocity, non-verbal communication, and understanding relationships. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, § 299.00 (Am. Psychiatric Ass'n 5th ed. (2013). A report accompanying Joe R.'s 2012 Individualized Education Plan (IEP) states, among other things, "Joe experiences difficulty participating in reciprocal conversation. He also has a difficult time interpreting and using social cues which impacts his ability to interact in an age appropriate manner with his peers […] Joe … does not understand or use rules governing social behavior. He has little or no ability to make or keep friends but does express a desire to have them. He struggles with changing his behavior to match the environment." (Dkt. 79, Ex. 10 at 3). Similarly, a 2012 Speech and Language evaluation notes Joe. R's history of deficits in social reciprocity and communication, as well as his difficulty "in responding to teasing, anger, failure, and disappointment" and reading and interpreting non-verbal cues of others. (*Id.* at 4, 11).

Impaired. (Dkt. 79, Ex. 11).[4] Vera Williams, the boys' special education math teacher, testified that she would "describe the emotional level of both children to be similar to that of a child who is seven to eight years old." (Dkt. 79, Ex. 21 at 34; Ex. 18 at 4).

Specifically, Plaintiffs allege that from September 2013 through February 26, 2014, J.J. touched Joe R.'s groin area and penis above and below his clothes and engaged him in kissing and other sexually inappropriate behaviors. (Dkt. 12 at 7-8). The incidents are alleged to have occurred (1) on a regular basis in a small, side-room, adjoining a class room, in which teacher Vera Williams allegedly placed J.J. and Joe R. during math class,[5] (2) once during an enrichment period called "Academic 20," (3) once in an empty classroom, (4) once in a bathroom stall and (5) on February 26, 2014 during Stacey Becker's special education English class. (Dkt. 79 at 27-28). According to Detective Bender, J.J. admitted to most of this conduct. (Dkt. 79, Ex. 20 at 27-30).[6] At his deposition, Joe R. used the name "the beast" to

---

[4] J.J.'s education records dating back to pre-school reflect a long history of serious behavioral issues, including: mood swings and difficulties with boundaries (Dkt. 79, Ex. 11 at 37); violent, threatening, and intimidating behavior (including biting and hitting) toward peers (*Id.* at 5, 11, 19, 48); and difficulty in respecting peers' personal space, including acts of unwanted affection such as hugging and kissing. (Dkt. 79, Ex. 11 at 2, 3, 5, 21, 24, 29, 30, 43).

[5] Vera Williams testified that she never put J.J. and Joe. R in this room nor ever saw them go in on their own. (Dkt. 79, Ex. 22 at 35). Detective Michael Bender of the Novi Police Department (Novi PD), whose investigation of these incidents is discussed below, see *infra* text accompanying notes 16-17, testified that the evidence indicated that the boys did go into the room and touching occurred there. (Dkt. 79, Ex. 17 at 46-47). For pictures of the room see Dkt. 79, Ex. 24 at 3-4.

[6] The Court notes that while arguably hearsay, J.J.'s statements to Detective Bender have not been objected to by any party and would most likely be admissible at trial if Plaintiffs call J.J., who is on their witness list. (Dkt. 28 at 4). Under Federal Rule of Civil Procedure 56, the Court, therefore, may consider these statements, and others like them, on summary judgment. *See* Fed. R. Civ. P. 56(c)(2); *id.* advisory committee's note to 2010 amendment.

describe J.J. and referred to the sexual harassment incidents as J.J. "conquering" him. (Dkt. 79, Ex. 25 at 55-56). Additionally, Joe R. testified that he and J.J. "always tried to hide" their behavior, and that on February 14, 2014 he asked J.J. to be his valentine. (*Id.* at 36-37).

Regarding the February 26, 2014 incident in Ms. Becker's English class, another student, J.P., who was a classmate of J.J. and Joe R., admits to having taken a cell phone video of J.J. touching Joe R., a short segment of which is in the record and the Court has reviewed. (Dkt. 79, Ex. 28 at 11; Ex. 33).[7] In the video, J.J. and J.P. are seated at desks to the right and left of Joe R.'s desk respectively, forming a semicircle. (Dkt. 79, Ex. 33). J.J.'s hand is rested, under the desks, on Joe R.'s upper right thigh. (*Id.*). J.P. testified that, while filming, the boys were all reading and J.P. "kind of like put [his] head down" and put his cell phone "on [his] lap so [he] could [film J.J. and Joe R.] and the teacher wouldn't notice." (Dkt. 79, Ex. 28 at 17).  Neither the video nor any other non-testimonial evidence in the record indicates how many other students were in the class. According to Ms. Becker, there were, at most, three other students in the room in addition to J.J., J.P. and J.R. (totaling six), but it may have been only the three boys involved in the incident. (Dkt. 79, Ex. 22 at 11-13).

In addition, neither the video nor anything else in the record establishes with certainty which teacher was present while J.P. filmed J.J. touching Joe R. in Ms.

---

[7] The video in the record is a thirty-second recording, which yet another student made by recording J.P.'s original video. J.P.'s original video has been destroyed.  (Dkt. 79, Ex. 2 at 124-25). How and why J.P.'s original video was deleted is a point of controversy discussed below. *See infra* text accompanying notes 14-15.

Becker's English classroom.  There is evidence that both Ms. Becker and Ms. Jean Solomon, a substitute teacher employed and placed at NMS by EDUStaff, a staffing agency and Michigan Limited Liability Company, were in the school building that day, but testimony conflicts on the question of which teacher was present when the incident occurred. (Dkts. 85, Ex. 73; 78, Ex. C). J.P. testified that his "regular teacher—" Ms. Becker—was in the classroom. (Dkt. 79, Ex. 28 at 15). Assistant Principal Comb, who viewed the original four-minute cell phone video before it was destroyed, testified that, although only the lower extremities of the teacher were visible, they did not appear to him to belong to Ms. Becker. (Dkt. 79, Ex. 3 at 81, 140). Ms. Becker testified that she was in the NMS building on the date and during the time period when the video would have been made, but that she was not then in her classroom, as Ms. Solomon was covering for her. (Dkt. 79, Ex. 22 at 59-61). Ms. Solomon admits to having been at NMS on the date and time in question, but testified that she was not in Ms. Becker's classroom when J.P. filmed J.J. touching Joe R. (Dkt. 79, Ex. 34 at 15-16). NMS and NCSD records show only that on February 26, 2014, Ms. Solomon was assigned to substitute at NMS for teacher Sara Lieberman for the entire day. (Dkt. 78, Ex. C at 2; Dkt. 79, Ex. 36 at 2).[8]

---

[8] In their testimonies, Principal Schriner and Jean Solomon indicate that Sara Lieberman taught in a different classroom from the one used by Stacey Becker. (Dkt. 79, Ex. 2 at 103; Dkt. 79, Ex. 34 at 15-16). Consequently, if Ms. Solomon was in fact assigned to Ms. Lieberman's class room, she would not have interacted with J.J. or Joe R. because she would not have been working in Ms. Becker's classroom, where the incident occurred.

*The Discovery of J.J.'s Alleged Harassment of Joe R. and the NMS and Novi PD*
*Investigations*

Before the incident on February 26, 2014 occurred, the evidentiary record

indicates that at least three NMS teachers had seen J.J. and Joe R. holding hands

or touching during classes on at least five occasions. Math teacher Ms. Vera

Williams testified that in September 2013 she saw J.J.'s hand on Joe R.'s leg, and

that on February 25, 2014 she also saw Joe R. put his hand on J.J.'s leg. (Dkt. 79,

Ex. 21 at 29-31). According to Detective Bender, Academic 20 teacher Ms. Margaret

Sheeran saw J.J. and Joe R. holding hands on one occasion during the 2013-14

school year. (Dkt. 79, Ex. 20 at 25).[9] Ms. Becker testified that she saw the boys

holding hands around December, 2013 or January, 2014 and again in February,

2014. (Dkt. 79, Ex. 22 at 32-34; Ex. 86). In addition, Ms. Becker testified that on

February 14, 2014 Joe R. entered her classroom crying and told her that he was

upset because he asked J.J. to be his valentine and J.J. said no. (Dkt. 79, Ex. 22 at

39). In response to these incidents, the teachers either physically separated or

verbally admonished the boys or ignored the behavior;[10] there were no formal

---

[9] This statement too may be considered on summary judgment. *See supra* note 6.

[10] Ms. Williams testified that when she observed J.J.'s hand on Joe. R's leg in September 2013, she said "we don't touch each other there" and told J.J. to remove his hand, and when she saw Joe R. touch J.J.'s leg in February 2014 she similarly instructed him to stop doing so. (Dkt. 79, Ex. 21 at 29-31). In her interview with Detective Bender, Ms. Sheeran stated that when she saw the boys holding hands she asked them if "everything was OK," and that they then let go of each other. (Dkt. 79, Ex. 20 at 25). In a written incident report, Ms. Becker stated that when she saw the boys holding hands in December 2013, they stopped as soon as they noticed her looking at them; with respect to her January 2014 observation of J.J. and Joe R. holding hands, she testified that she separated them to opposite ends of the table. (Dkts. 87, Ex. 86 at 2; 79, Ex. 22 at 34).

interventions, and no NMS administrators were ever apprised of the issue, nor were either of the boys' parents contacted.

On February 27, 2014, the day after J.P. filmed J.J. touching Joe R. in Ms. Becker's classroom, the incident came to the attention of NMS administrators. That morning, NMS social worker Nicole Colone learned from students in her group social work class that J.P. possessed a cell phone video recording of J.J. touching Joe R. (Dkt. 79, Ex. 8 at 77-78; Ex. 30). At 12:30 p.m., she met with Assistant Principal Comb to discuss this matter. (Dkt. 79, Ex. 3 at 59).  Mr. Comb states that he immediately interviewed J.P., confirmed the video's existence and learned that J.P. and two other classmates possessed copies of it; he testifies that he immediately retrieved all three students' cell phones. (*Id*. at 61-63).  Mr. Comb then interviewed J.J. and Joe R. (*Id*. at 67). Based upon the information he gathered, he concluded that there was an "indication of a mutual relationship." (*Id*. at 73). Later that afternoon, Mr. Comb called Joe R.'s mother, J.R., to notify her of what occurred; she agreed to meet him, together with her husband, C.R., at 8 a.m. the following morning. (*Id*. at 80).

According to J.R., when Joe R. came home from school that evening, the two spoke briefly about J.J. (Dkt. 79, Ex. 23 at 138). Later that evening, C.R., Joe R.'s father, returned from work, and Lindsay Ludtke, an occupational therapist, came over for her weekly appointment with Joe. R. (*Id*. at 147). At that time, J.R. testified, she, C.R. and Lindsay Ludtke questioned Joe R. in detail about his

9

relationship with J.J. (*Id.* at 148).[11] Joe R. testified that he spoke with his parents and Lindsay Ludtke that night, but that he could not recall the questions they asked him. (Dkt. 79, Ex. 25 at 67-68). After speaking with Joe R. about his relationship with J.J., J.R. and C.R. decided to cancel the next morning's meeting with Mr. Comb, because they "knew [they] needed to file a police report." (Dkt. 79, Ex. 23 at 156).

On February 28, 2014, in light of what had occurred the day before, Principal Schriner testified that she convened a meeting with Mr. Comb and social worker Nicole Colone. (Dkt. 79, Ex. 2 at 121).[12] At the meeting, they discussed Mr. Comb's interviews with J.P., J.R. and Joe R. and watched J.P.'s original video recording of the February 26, 2014 incident. (*Id.* at 121-22). Based on what Mr. Comb learned from the interviews, and what they all saw in J.P.'s video, the group concluded that the incident took place in Ms. Becker's sixth period English class, that Joe R. was "mutually participating" in the incident, and that the appropriate consequence for both boys was a three-day out-of-school suspension. (*Id.* at 121-22; Dkt. 79, Ex. 26).[13]

---

[11] Defendant NCSD questions the reliability of this discussion, calling it an "inappropriate forensic interview." (Dkt. 86 at 12).

[12] At his deposition, Mr. Comb could not remember the date on which the group met, but testified that he recorded the date in an incident report, which corroborates that the group met on February 28, 2014. (Dkt. 79, Ex. 3 at 28; Ex. 27). Ms. Colone testified, however, that the group met on March 3, 2014 (Dkt. 79, Ex. 8 at 86). This inconsistency is relevant to the issue of evidence spoliation. *See* discussion *infra* note 16 and accompanying text.

[13] In May 2014, at C.R. and J.R.'s lawyer's request, NMS removed Joe R.'s suspension from his record. (Dkt. 79, Ex. 23 at 292-93).

At an unspecified time later in the afternoon on February 28, 2014 Principal Schriner, Mr. Comb and Ms. Colone summoned J.P. to Principal Schriner's office. (Dkt. 79, Ex. 2 at 124). Principal Schriner testified that during this meeting, with J.P.'s father on speakerphone, they returned J.P.'s cell phone to him and, at their suggestion, he deleted the video of J.J. touching Joe R. (*Id.* at 126).[14] Principal Schriner explained that she, Mr. Comb, and Ms. Colone believed it would be in J.P.'s best interest to delete the video because "it would be a form of bullying if he were to show it to other students." (*Id.*).[15] Principal Schriner further stated that before the group encouraged J.P. to delete the video, she had conferred with Detective Jonathan Zabick, a member of the Novi Police Department assigned to NMS as the School Resource Officer. (*Id.* at 126). Detective Zabick testified that, when he spoke with Principal Schriner about the video, he communicated to her that it would be "OK" to recommend to J.P. that he delete it, because, according to Zabick's supervisor, the Novi Police Department determined that it had no right to secure a video of a twelve or thirteen-year-old "touching the crotch," "over the clothes" of a peer. (Dkt. 79, Ex. 41 at 70-72).

Around the same time that Principal Schriner, Mr. Comb and Ms. Colone met with J.P. on February 28, 2014, Joe R.'s parents, J.R. and C.R., were preparing to

---

[14] As to the other two cell phones that Mr. Comb retrieved from J.P.'s classmates that also contained copies of the video, Mr. Comb testifies that he does not "recall exactly . . . every transfer of custody," but that he "believes at some point those . . . kids' parents were contacted and . . . the parents' could come pick up the phone." (*Id.*, Ex. 3 at 63). No efforts were made to preserve those recordings.

[15] At his deposition, J.P. was unable to remember whether he deleted the video at Schriner, Comb, and Colone's encouragement, or whether it was already deleted when they returned his phone to him. (Dkt. 78, Ex. 28 at 19-20).

file a report with the Novi Police Department, which they did at 4:30 p.m. that same day. (Dkt. 79, Ex. 23 at 163; Dkt. 79, Ex. 20). [16]  The case was assigned to Detective Michael Bender, who, together with Detective Zabick, conducted an investigation. (Dkt. 79, Ex. 17 at 124; Ex. 20). Detectives Bender and Zabick interviewed all potential witnesses at NMS (Dkt. 79, Ex. 17 at 118; Ex. 20 at 15-28), reviewed the thirty-second clip of J.P.'s original video (which they recovered from the cell phone of one of the students with whom J.P. shared the video) (Dkt. 79, Ex. 17 at 168; Ex. 20 at 13) and had Joe. R forensically interviewed at a child advocacy center. (Dkt 79; Ex. 17 at 24-28; Ex. 20 at 23).

Based on his findings, Detective Bender concluded that touching occurred between Joe R. and J.J. in all the locations Plaintiffs allege—*i.e.* Ms. Becker's English class, the Academic 20 period, the bathroom, an empty classroom and Ms. Williams's math class. (Dkt. 79, Ex. 17 at 32-47). Defendants do not contest this finding. (Dkt. 86 at 11). Detective Bender also concluded that the acts between J.J. and Joe R. were "mutual." (Dkt. 79, Ex. 17 at 152). At the end of his investigation, Detective Bender submitted his findings to the Oakland County Prosecuting Attorney's office. On April 24, 2014, he received an email from that office stating

---

[16] Principal Schriner maintains that at the time she, Mr. Comb and Ms. Colone recommended to J.P. that he delete the video, no one at NMS knew that a police report regarding the incident had been filed (Dkt. 79, Ex. 2 at 222). It is on this point that the inconsistency between the recollections of Principal Schriner/Mr. Comb, that the meeting occurred on February 28, 2014, and that of Nicole Colone, that it took place on March 3, 2014, becomes germane. *See supra* note 12. All agree that during that meeting, J.P.'s video was deleted. If that meeting took place on March 3, 2014, as Ms. Colone testified, there would have been more time for Principal Schriner, Mr. Comb and Ms. Colone to have become aware that a police report had already been filed on February 28, 2014.

that all charges against J.J. were declined, and that the case was closed (Dkt. 79, Ex. 17 at 180; Ex. 20 at 34).

According to Principal Schriner, when she learned of the police investigation and the allegations of chronic abuse, she conducted her own internal investigation at NMS, for which she admits there is no documentation. (Dkt. 79, Ex. 2 at 45). Principal Schriner testified that her investigation consisted of speaking with Ms. Williams and Ms. Sheeran, "scan[ing] through" NMS hallway security videos, and reviewing J.J's and Joe R.'s educational and behavioral records. (*Id.* at 47-68). She explained that in her review of the videos she saw footage of J.J. and Joe R. walking toward an empty classroom together, as well as footage of the boys walking in tandem into a bathroom. (Dkt. *Id*. at 47-53). As Detective Bender testifies, Principal Schriner provided him with the footage of the boys' walk toward the empty classroom, but not the footage of J.J. and Joe R. entering the bathroom. (Dkt. 79, Ex. 17 at 17).[17] Based on Principal Schriner's and Mr. Comb's investigations, the NMS administration concluded that they were "unable to find any conclusive evidence establishing that any sexual contact . . . occurred other than the incident captured on video by J.P., which appeared to be consensual." (Dkt. 83 at 26; Dkt. 84 at 28).

After February 27, 2014, J.R. and C.R. never returned Joe. R to NMS. J.R. testifies that NMS staff, including Principal Schriner, repeatedly pressured her to

---

[17] According to Principal Schriner, though she was aware that there was an allegation of touching between the boys in a bathroom, she did not provide this footage to Detective Bender because, in her opinion, it "wasn't in any way suggestive of anything happening." (*Id*. at 52-53).

allow Joe R. to return to school, including to his classes with J.J.  Because J.R. did not believe Joe R. would be safe there, she withdrew her son from NMS. (Dkt. 79, Ex. 23 at 178). Principal Schriner admits that her intention was for Joe R. to return to his normal class schedule with J.J., because neither the police nor NMS investigations "revealed that Joe. R had been subject to repeated molestations." (*Id.* at 170). Accordingly, Principal Schriner characterized C.R. and J.R.'s decision not to return Joe R. to NMS as "voluntarily…keep[ing] him home." (Dkt. 79, Ex. 2 at 168). Plaintiffs state that Joe R. has been in therapy since the alleged abuse came to light. (Dkt. 37 at 90).

## II.    Summary Judgment

Summary judgment is proper where the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met that burden, the non-moving party must point to evidence supporting its position that is "significantly probative" and more than "merely colorable." *Liberty Lobby*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to

defeat a motion for summary judgment. *Id*. at 252. In deciding whether a reasonable jury could return a verdict for the nonmoving party, the Court must view the evidence, and draw all reasonable inferences, in that party's favor. *Id*. at 255.

### III.   Plaintiffs', the Individual Novi Defendants', and NCSD's Motions for Summary Judgment (Dkts. 79, 83, 84)

Plaintiffs bring claims against Assistant Principal Comb, Superintendent Matthews, Principal Schriner and Math teacher Vera Williams ("the Individual Novi Defendants"), as well as NCSD. The Individual Novi Defendants and NCSD each move for summary judgment on all of Plaintiffs' claims against them. (Dkts. 83, 84) and Plaintiffs move for summary judgment on two of their claims. (Dkt. 79).

The Court will resolve these claims in the order that they appear in the Amended Complaint. (Dkt. 12).  As to Counts I and II, alleging violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. and for Title IX Retaliation against NCSD, Defendant NCSD moves for summary judgment on both of these counts, while Plaintiffs move for summary judgment on Count I.  With respect to Counts III and IV, which allege violations of 42 U.S.C. § 1983 against NCSD and the Individual Novi Defendants, those Defendants seek summary judgment on those two counts; Plaintiffs seek it as to Count III only. NCSD moves for summary judgment as to Count V, charging a violation of § 504 of the Rehabilitation Act of 1973 and the Americans with Disability Act of 1990 (ADA), 42 U.S.C. 12101, *et seq*.  As to Counts VI and VII, which charge violations of the Michigan Elliot-Larsen Civil Rights Act (Michigan ELCRA) and the Michigan

15

Persons With Disabilities Civil Rights Act (Michigan PWDCRA), both NCSD and the Individual Novi Defendants seek summary judgment.  The Individual Novi Defendants move for summary judgment on Count VIII, seeking damages for Intentional Infliction of Emotional Distress (IIED), while Defendant Vera Williams asks for the same as to Count IX, charging her with Gross Negligence. Finally, Defendants Jean Solomon and EDUStaff move for summary judgment on Plaintiffs' negligence and respondeat superior claims in Counts X and XI.

### A.   NCSD's and Plaintiffs' Motions for Summary Judgment on Plaintiffs' Title IX Claims (Counts I and II)

Plaintiffs bring a claim under 20 U.S.C. § 1681 (Title IX) against NCSD for J.J.'s alleged sexual harassment and abuse of Joe R. (Count I). In addition, Plaintiffs bring a claim under Title IX for retaliation against NCSD. (Count II). NCSD moves for summary judgment on both claims. (Dkt. 84 at 29-37). In response, Plaintiffs filed a cross-motion for summary judgment on their sexual harassment claim only. (Count I). (Dkt. 79 at 47-54). The Court will address these claims in the following order: NCSD's motion for summary judgment on Plaintiffs' sexual harassment claim (Count I), Plaintiffs' cross-motion for summary judgment on this claim, and then Defendants' motion for summary judgment on Plaintiffs' retaliation claim. (Count II).

Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial

assistance." 20 U.S.C. § 1681(a). In *Davis v. Monroe County Board of Education*, the Supreme Court held that a federal funding recipient may be liable under Title IX for deliberate indifference to student-on-student sexual harassment. 526 U.S. 629, 643 (1999). To establish a prima facie case of student-on-student sexual harassment under Title IX, a plaintiff must produce evidence demonstrating the following: (1) sexual harassment so severe, pervasive, and objectively offensive that it could be said to deprive plaintiff of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment. *Stiles ex rel. D.S. v. Grainger County, Tenn.,* 819 F.3d 834, 848 (6th Cir. 2016) (citing *Davis,* 526 U.S. at 650; *Patterson v. Hudson Area Schs.,* 551 F.3d 438, 444-45 (6th Cir. 2009)).[18]

The Court turns first to NCSD's motion for summary judgment on Plaintiffs' Title IX sexual harassment claim. (Count I). With respect to the first element, Plaintiffs have created a genuine issue of material fact as to whether J.J.'s alleged harassment and abuse of Joe R. was sufficiently severe, pervasive, and objectively

---

[18] In their motion for summary judgment, Plaintiffs argue that "Title IX liability can flow from two harassment time periods*:* (a) when a school exhibits deliberate indifference before a harassing attack . . . or (b) when a school exhibits deliberate indifference after a harassing attack…" (Dkt. 79 at 47 (citing *Lopez v. Metro. Gov't of Nashville,* 646 F. Supp.2d 891, 917-18 (M.D. Tenn. 2009))). Some commentators and circuits have recognized "before-the-fact" deliberate indifference in the Title IX context. *See* Catherina A. Mackinnon, *In Their Hands: Restoring Institutional Liability for Sexual Harassment in Education.* 125 Yale L.J. 2038, 2076-77 (2016) (citing *Williams v. Bd. Of Regents of the Univ. Sys. Of Ga.,* 477 F.3d 1282, 1296 (11th Cir. 2007); *Simpson v. University of Colorado,* 500 F.3d 1170, 1173 (10th Cir. 2007)). The Sixth Circuit, however, has not recognized Title IX liability on the basis of deliberate indifference to an individual's propensity to harass before an attack has occurred. The Court, therefore, declines to analyze Plaintiffs' claim according to the "before and after" scheme they propose.

offensive for Title IX purposes: Plaintiffs have provided evidence indicating that over the course of one year J.J. subjected Joe R. to repeated over and under the clothes genital touching, and hugging and kissing. In addition, in recounting these experiences, Joe. R described J.J. as "the beast" and characterized J.J.'s actions as "conquering him." Ultimately, C.R. and J.R. removed Joe R. from NMS because they felt that it was unsafe to allow Joe R. to be near J.J. As such, Plaintiffs have presented evidence upon which a reasonable jury could conclude that J.J.'s alleged harassment of Joe R. was severe, pervasive, and objectively offensive.

The record is also sufficient to raise a genuine issue of fact as to the second element of the *Davis* test—that is, whether or not NCSD had actual knowledge of J.J.'s harassment of Joe R. Actual knowledge requires only that a single school administrator with authority to take corrective action knew of the sexual harassment. *Stiles*, 819 F.3d 834, 848 (citing *Gebser v. Lago Vista Indep Sch. Dist.* 524 U.S. 274, 290 (1998)). Plaintiffs meet this threshold because the evidence shows that on February 27, 2014 Principal Schriner and Mr. Comb watched a four-minute video of J.J. petting Joe R. in his groin region while in Ms. Becker's classroom. In addition, Principal Schriner testified that Detective Zabick told her about the police report that C.R. and J.R. filed on the day that they filed it—February 28, 2014—and Mr. Comb testified that Schriner told him about the police report by March 3, 2014 at the latest. (Dkt. 79, Ex. 2 at 85; Ex. 4 at 91). Plaintiffs have thus presented sufficient evidence to demonstrate that Principal Schriner and Mr. Comb knew that J.J. was touching Joe R. inappropriately.

18

The third prong of the *Davis* test requires Plaintiffs to show that school officials were deliberately indifferent to peer-on-peer sexual harassment. School administrators will be liable under the deliberate indifference standard only if their response was "clearly unreasonable in light of the known circumstances." *Stiles*, 819 F.3d at 848 (quoting *Davis*, 526 U.S. at 648). Additionally, the deliberate indifference must "at a minimum cause students to undergo harassment or make them liable or vulnerable to it." *Vance v. Spencer County Public School Dist.* 231 F.3d 253, 260 (6th Cir. 2000) (quoting *Davis*, 526 U.S. at 645).

The Court finds that Plaintiffs have produced evidence upon which a reasonable jury could conclude that Principal Schriner and Mr. Comb were deliberately indifferent to J.J.'s alleged harassment of Joe R: when Principal Schriner and Mr. Comb discovered J.P.'s video of J.J. touching Joe R., they responded by encouraging J.P. to delete the video (possibly, according to Nicole Colone's testimony, after being in a position to know that Joe R.'s parents had filed a police report in regard to the incident), suspending Joe R., and pressuring C.R. and J.R. to return their son to school, including all of his classes with J.J., according to their view that the boys' behavior was "mutual" and Joe R. was therefore in no danger. In addition, Principal Schriner admits to deleting hallway video footage showing the boys entering a bathroom together, even as she knew of Detective Bender's ongoing investigation into Joe R.'s allegations of chronic abuse by J.J.  Indeed, their course of deleting material evidence, adopting a theory of mutuality to explain away the boys' behavior, and insisting that Joe R. be returned

19

to his normal class schedule, including all classes with J.J., could reasonably be described as clearly unreasonable in light of the circumstances—including the fact that they had seen a video of highly inappropriate touching between J.J. and Joe R. and that the situation was serious enough for Joe R.'s parents to have filed a police report. Moreover, a reasonable jury could conclude that Principal Schriner and Mr. Comb's clearly unreasonable response left Joe R. vulnerable to further abuse at the hands of J.J.; but for C.R. and J.R. keeping Joe R. from returning to NMS, Principal Schriner would have immediately placed him back in all of his classes with J.J., exposing him to the same risk for abuse which was demonstrated on the video and had been previously observed on several occasions by both teachers and students.

Plaintiffs have created issues of fact for trial with respect to every element of their Title IX sexual harassment claim against NCSD. (Count I). A reasonable jury could conclude that Joe R. was subject to severe, pervasive and objectively offensive harassment at the hands of J.J., and that when Principal Schriner and Mr. Comb discovered this harassment their response was clearly unreasonable, such that it left Joe R. vulnerable to future abuse. Accordingly, NCSD's motion for summary judgment on Plaintiffs' Title IX sexual harassment claim (Count I) against it is DENIED.

With respect to Plaintiffs' cross-motion for summary judgment on their Title IX sexual harassment claim against NCSD (Count I), the Court applies the same law to the same facts, but must view the evidence in a light most favorable to the

non-moving party, NCSD. So viewed, the school district has presented evidence sufficient to create issues of fact for trial on Plaintiffs' Title IX sexual harassment claim against it. (Count I). With respect to the severity of J.J.'s alleged harassment, NCSD admits only to the incidents of above-the-clothes touching and hand-holding that appear in J.P's cell phone video and that Ms. Williams and Ms. Becker testified to have personally observed. If a jury were to find that these were the only incidents that occurred, it might reasonably conclude that the nature of the harassment Joe R. suffered at the hands of J.J. was not sufficiently severe or pervasive for NCSD to be liable on a Title IX sexual harassment claim. Moreover, NCSD contends that upon learning of Joe R.'s allegations of chronic abuse, Principal Schriner and Mr. Comb each conducted thorough investigations, recommended that Joe R. return to school because they genuinely believed J.J. did not present a threat to him, and only recommended that J.P. delete his cell phone video because Officer Zabick told them the Novi Police Department had no use for it. Viewing the evidence in the light most favorable to Defendants, a reasonable jury could find that Principal Schriner's and Mr. Comb's responses to Joe R.'s allegations were not clearly unreasonable in light of the nature of the harassment and the fact that the police officer communicated to NMS that there was no need for J.P.'s cell phone video.

Because issues of fact remain as to the severity and pervasiveness of J.J.'s alleged harassment of Joe. R, and, relatedly, the reasonableness of Principal Schriner's and Mr. Comb's responses to the situation, Plaintiffs' motion for

summary judgment on their Title IX sexual harassment claim against NCSD (Count I) is DENIED.

In addition to a claim for sexual harassment, Plaintiffs also bring a Title IX claim for retaliation against NCSD. (Count II). A plaintiff can establish a retaliation claim either through direct evidence or through circumstantial evidence that supports the inference of retaliation. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___U.S. ___133 S. Ct. 2517 (2013). Here, Plaintiffs do not present direct evidence that NCSD retaliated against Joe R. because he complained of sexual harassment. Instead, Plaintiffs argue that retaliation can be inferred based on circumstantial evidence. In evaluating retaliation arguments based on such evidence, courts must apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). According to the *McDonnell Douglas* framework, a plaintiff has the initial burden of demonstrating a *prima facie* case of retaliation by establishing: 1) the plaintiff engaged in activity protected under Title IX; (2) plaintiff's exercise of her protected rights was known to defendant; (3) an adverse [educational] action was subsequently taken against the student or the student was subjected to severe or pervasive retaliatory harassment by a teacher or administrator; and (4) there was a causal connection between the protected activity and the adverse [educational] action. *Fuhr,* 710 F.3d at 674. Should a plaintiff succeed in establishing a *prima facie* case, a presumption of unlawful

retaliation arises and the defendant is then faced with the burden to produce evidence that rebuts the presumption by "articulating some legitimate, nondiscriminatory reason for its action." *Id.* (quoting *Spengler*, 615 F.3d at 542).

Viewing the evidence in Plaintiffs' favor, it is sufficient to establish a *prima facie* case of retaliation based on circumstantial evidence. Defendants dispute neither that Plaintiffs' complaints to NMS and the Novi Police were protected activity nor that NMS employees knew about Plaintiffs' complaints. The crux of the analysis is thus whether Joe R. suffered any adverse actions as a result of complaining of J.J's harassment and whether there was a causal connection between Joe R.'s complaints and the adverse actions. After Principal Schriner and Mr. Comb viewed J.P.'s video and learned of the Novi Police report filed by C.R. and J.R., they made the decision to suspend Joe R. from school. (Both Joe R. and J.J. were suspended.) Defendants argue that because the suspension was eventually "removed" from Joe R.'s record after C.R. and J.R. hired a lawyer who advocated for its removal, it no longer qualifies as an adverse action. Defendants provide no support for this proposition. Moreover, Joe R.'s record still reflects the incident and includes a characterization of Joe R.'s conduct as "allowing another student to touch his privates." (Dkt. 87, Ex. 41 at 5). Further, in addition to the suspension, Joe R. was marked absent, and his work was marked incomplete, during the period that his parents kept him from returning to NMS because Principal Schriner had decided that Joe R. would be returned to his normal class schedule, including all his classes with J.J. (Dkts. 83, Ex. 44; 87, Ex. 99). Plaintiffs

23

have thus presented sufficient evidence to raise a jury question as to whether adverse actions were taken against Joe R. subsequent to his complaints of sexual harassment to NMS and the Novi PD.

The next issue for the Court with respect to Plaintiffs' Title IX retaliation claim is whether Plaintiffs have produced sufficient circumstantial evidence to create a fact issue as to whether Joe R.'s complaints of sexual abuse caused the adverse actions taken against him. Plaintiffs meet this burden. Viewing the evidence in the light most favorable to Plaintiffs, the record allows an inference that in response to allegations of sexual abuse at their school, Principal Schriner and Mr. Comb took action to suppress any evidence that the abuse had actually occurred: they deleted evidence, suspended Joe R. and marked his educational record with an incident report, absences, and notes of incomplete work, and told his parents that it was safe for Joe R. to return to school, J.J. and Joe R.'s relationship was mutual, and that no remedial action was needed. From this evidence, a reasonable jury could conclude that had Joe. R and his parents never complained of sexual harassment—Joe R. would not have suffered a suspension, nor the absences, incomplete assignments, or incident report annotations that now appear in his permanent record.

Because Plaintiffs have produced evidence sufficient to demonstrate that Joe R. suffered adverse educational actions for complaining about J.J.'s alleged sexual harassment, they have succeeded in establishing a prima facie case of Title IX retaliation. The burden now shifts to Defendants to rebut a presumption of

unlawful retaliation by articulating a legitimate reason for the adverse actions Joe R. suffered. Defendants' efforts to meet this burden are insufficient to remove the question from the jury. In response to Plaintiffs' retaliation claim, Defendants argue simply that there is no evidence Joe R. was subjected to an adverse action because his suspension was revoked. (Dkt. 84 at 36-37). Defendants provide no authority for the proposition that the revocation of a suspension operates to nullify that suspension as an adverse action. While Defendants proffer a reason for the suspension, Joe R.'s alleged complicity in the touching incident, the validity of this reason as legitimate is very much a question of fact. Moreover, even if the suspension's revocation mitigated its effect as an adverse action, there is still a question of fact as to whether the reasons given justified the negative annotations that were placed on Joe. R's student record.

Accordingly, because Plaintiffs have established a prima facie case of unlawful retaliation under Title IX, and because Defendants have failed to rebut the presumption of unlawful retaliation sufficiently to remove any question of material fact, NCSD's motion for summary judgment on Plaintiffs' retaliation claim against it (Count II) is DENIED.

### B. The Individual Novi Defendants', NCSD's, and Plaintiffs' Motions for Summary Judgment on Plaintiffs' § 1983 Claims (Counts III and IV)

Under 42 U.S.C. § 1983, Plaintiffs allege that the Individual Novi Defendants deprived Joe R. of his constitutional rights to equal protection and substantive due process, including the right to personal security and bodily

integrity, and that NCSD's customs, policies, and practices caused these deprivations. (Counts III and IV).  (Dkt. 12 at 29-35, 26-29).[19] The Individual Novi Defendants and NCSD each move for summary judgment on these claims. (Dkts. 83 at 27-31; 84 at 37-41).[20]  Plaintiffs move for summary judgment only on their failure to train § 1983 claim against NCSD (Count III). (Dkt. 79 at 43-47). Since a school district cannot be liable under § 1983 if a plaintiff fails to show that at least one of its employees inflicted a constitutional harm, *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 471 (6th Cir. 2006), the Court turns first to the Individual Novi Defendants' motion for summary judgment, then addresses NCSD's and Plaintiffs' motions.

In their Amended Complaint, Plaintiffs allege that the Individual Novi Defendants and NCSD deprived Joe R. of his Fourteenth Amendment rights to equal protection, due to intentional discrimination against Joe R. based on the fact that he suffers from Autism Spectrum Disorder, and his Fourteenth Amendment due process right to liberty, including the right to bodily integrity. (Dkt. 12 at 26). In their responses, however, Plaintiffs fail to articulate clear theories of an equal

---

[19] In their Amended Complaint, Plaintiffs also allege that the Individual Novi Defendants and NCSD deprived Joe R. of "his constitutional right to a safe, public education in a non-hostile learning environment." (Dkt. 12 at 26, 29). Plaintiffs fail to explain, however, where in the Constitution this right is found. In its motion for summary judgment, NCSD characterizes this claim as duplicative of Plaintiffs' substantive due process claim. (Dkt. 84). In their subsequent filings, Plaintiffs neither object to this characterization nor make any other mention of Joe R.'s right to a safe, public education in a non-hostile learning environment. The Court, therefore, will treat this claim as a part of Plaintiffs' substantive due process claim.

[20] The Court notes that the Individual Novi Defendants, although state actors, have not raised qualified immunity in their responses as an affirmative defense to any of these claims. *Evans-Marshall v. Board of Educ. Of Tipp City Exempted Village School Dist.*, 428 F.3d 223, 232 (6th Cir. 2005).

26

protection and due process violation and instead present a generalized medley of arguments regarding the Individual Novi Defendants' and NCSD's alleged § 1983 violations. (Dkt. 87 at 75-81). The Court, therefore, will independently analyze the equal protection and due process claims that Plaintiffs present in their Amended Complaint according to controlling Sixth Circuit and Supreme Court precedent.

The *sine qua non* of an equal protection claim is state discrimination against a plaintiff based on her membership in a certain class of persons. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). The Sixth Circuit recognizes two ways to prove an equal protection violation based on a school official's response to peer-on-peer harassment: (1) disparate treatment of one class of students who complain about peer mistreatment, and (2) deliberate indifference to discriminatory peer harassment. *Stiles ex rel. D.S. v. Grainger Cty., Tenn.,* 819 F.3d 834, 841 (6th Cir. 2016) (citing *Soper v. Hoben*, 195 F.3d 845, 852 (6th Cir. 1999); *Shively v. Green Local Sch. Dist Bd. Of Educ.,* 579 Fed. Appx 348, 356-57 (6th Cir. 2014); *Williams v. Por Huron Sch. Dist* 455 Fed. Appx. 612, 620 (6th Cir. 2012)).

To succeed on a disparate treatment theory, Joe. R must present evidence tending to show that NMS officials treated his complaints of peer harassment differently than they would have treated the complaints of a similarly situated, non-disabled student. *Stiles*, 819 F.3d at 852; *Gohl v. Livonia Pub. Sch. Sch. Dist*., 836 F.3d 672, 684 (6th Cir. 2016). Here, Plaintiffs proffer no evidence demonstrating how NMS officials responded to any other similarly situated, non-disabled student.  To succeed on a deliberate indifference theory, Plaintiffs must

27

present evidence indicating both that Joe R. was subjected to peer-harassment because of his disability and that school officials responded to it in a manner that was clearly unreasonable in the light of known circumstances. *Stiles*, 819 F.3d at 852. Within the context of their equal protection argument, Plaintiffs present no evidence that J.J. targeted Joe R. because of his disability.[21] Accordingly, because Plaintiffs have not presented evidence upon which a reasonable jury could conclude that the Individual Novi Defendants violated Joe R.'s equal protection rights under a disparate treatment or deliberate indifference theory, the Individual Novi Defendants' motion for summary judgment on Plaintiffs' § 1983 equal protection claim (Count IV) is GRANTED.

Plaintiffs' second theory of the Individual Novi Defendants' liability under § 1983 is that they violated Joe R.'s Fourteenth Amendment right to substantive Due Process, including his right to bodily integrity. The Due Process Clause of the Fourteenth Amendment protects against state actions which deprive a person of life, liberty, or property without due process of law; it does not protect persons against such deprivations caused by other private actors. *Stiles*, 819 F.3d at 853 (citing U.S. Const. amend. XIV, § 1; *Deshaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)).  There are, however, two exceptions to this rule: (1) when a person is in state custody and therefore in a "special relationship" with the state and (2) when the state creates or increases the risk of harm to a person—that is, when a "state-created danger" caused a plaintiff's injury. *Stiles*, 819 F.3d at 853.

---

[21] Plaintiffs do make such a claim, however, within the context of their § 504/ADA argument. *See supra* Part III.C.

In their complaint, Plaintiffs allege that the present case fits into both exceptions, thereby requiring NMS, under the Due Process Clause, to protect Joe R. from J.J.'s harassment.  In their briefing however, Plaintiffs only develop the state-created danger theory. With respect to the special relationship exception, Plaintiffs' argument fails. A special relationship "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Stiles*, 819 F.3d at 853 (citing *Deshaney*, 489 U.S. at 200). NMS imposed no limitations on Joe R.'s freedom to act. Moreover, the Sixth Circuit has "consistently rejected" the existence of a special relationship based on a school's knowledge of a student's special vulnerability. *Id*. at 854. Plaintiffs, therefore, cannot establish that NMS stood in a special relationship to Joe. R., comparable to, for example, the relationship between a state run psychiatric ward and an involuntarily committed mental patient.  *See Jones v. Union County, TN,* 296 F.3d 417, 428 (citing *Youngberg v. Romeo,* 457 U.S. 307, 319 (1982)).

With respect to the second exception, Plaintiffs have, however, presented evidence which raises a genuine issue of material fact as to whether some of Joe R.'s injuries were the product of a state-created danger. To succeed on a state-created danger theory, plaintiffs must establish: "(1) an affirmative act that creates or increases the risk to the plaintiff, (2) a special danger to the plaintiff as distinguished from the public at large, and (3) the requisite degree of state

culpability." *Id.* at 854 (citing *McQueen v. Beecher Cmty. Schs.* 433 F.3d 460, 464 (6th Cir. 2006)).

As to the first element, the word "affirmative" is interpreted strictly; "omissions," such as "failing to enforce school policy," do not qualify as affirmative acts that create or increase the risk to the plaintiff. *Stiles*, 819 F.3d at 854-55 (citing *Morrow v. Balaski*, 719 F.3d 160, 178 (3d Cir. 2013) (failing to expel a bully was not an affirmative act); *McQueen*, 433 F.3d at 465-66 (teacher leaving students unsupervised did not create or increase the risk of peer-on-peer shooting)). To determine whether an affirmative state action increased danger to an individual, a court must ask "whether the individual was safer before the state action than after it." *Id.* (citing *Jasinski v. Tyler*, 729 F.3d 531, 539 (6th Cir. 2013)). Plaintiffs argue that NCSD increased Joe R.'s risk of harassment by failing to properly train its staff about sexual harassment issues; that the Individual Novi Defendants increased Joe R.'s risk of harassment by failing to properly respond to J.J.'s and Joe R.'s conduct; and that Vera Williams increased Joe. R's risk of harassment by repeatedly placing him in a "seclusion room" with J.J. Because NCSD's alleged failure to train its staff, and the Individual Novi Defendants' alleged failure to properly respond to the boys' behavior, are omissions, they do not meet the strictly interpreted element of "affirmative acts" under a state-created danger theory of liability. The alleged conduct by special education Math teacher Vera Williams, however, is an affirmative act. Williams testified that she saw the boys touch each other in a manner that she considered inappropriate in September 2013. According

to Joe R.'s testimony, throughout the 2013-14 school year, she "put" him and J.J. in a small separate room, which Plaintiffs call a "seclusion room," adjacent to their regular math classroom, "a lot." (Dkt. 79, Ex. 25 at 71). In corroboration of Joe R.'s account, J.J. stated to Detective Bender that Vera Williams "always allowed" the boys to go into this room together. (Dkt. 79, Ex. 20 at 29). If true, placing Joe R. in, or allowing him to remain in, a small separate room with J.J., a much larger boy—who she had previously seen touch Joe R. inappropriately—is conduct that made Joe R. considerably more vulnerable to harassment than he would otherwise have been. Thus, although Ms. Williams denies that she ever allowed—let alone placed—the boys together by themselves in this separate room, Joe R. and J.J.'s statements create an issue of fact as to whether Ms. Williams committed an affirmative act which exposed Joe R. to a greater risk of being sexually harassed by J.J.

The second element the Court must consider is whether by placing Joe. R into this separate room with J.J., Ms. Williams created a special danger to Joe R. A "special danger exists where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large." *McQueen*, F.3d at 467-68. The facts adduced by Plaintiffs clearly create a jury issue regarding this prong: as established, before allegedly placing J.J. and Joe R. in the separate room with one another, Ms. Williams had already seen J.J. inappropriately touch Joe R., and, as she testified, at the time of the alleged harassment her belief was that each boy functioned at the level of a seven or eight-year-old. In addition, it is undisputed

that when the harassment is said to have occurred J.J. physically towered over Joe R., so that the possibility of physical intimidation would have been apparent. Thus, if Ms. Williams did repeatedly place J.J. and Joe R. in a separate room, alone with one another, a jury could reasonably conclude that this act created a danger for Joe R. that a member of the general public would not have experienced.

The third and final element of a state-created danger theory requires Plaintiffs to demonstrate that when Ms. Williams placed the boys in the separate room, she had the "requisite degree of culpability." In cases, as here, where the state actor had time for deliberation and reflection, the requisite degree of culpability is subjective recklessness, or an "aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the actor] must also draw that inference." *McQueen*, F.3d at 469. Subjective recklessness can be proven "circumstantially by evidence showing that the risk was so obvious that the official had to have known about it." *Id*. As discussed, Vera Williams testified that she had seen the boys inappropriately touching in September 2013 and that she believed they functioned like seven or eight-year-olds. The difference in their physical size was also patently evident to her. Accordingly, a reasonable jury could conclude that Ms. Williams had to know that repeatedly secluding J.J. and Joe. R in a room with one another placed Joe R. at a greater risk of further inappropriate touching by J.J.

Because Plaintiffs have presented sufficient evidence to create genuine issues of material fact regarding whether Ms. Williams, with the requisite

awareness, took affirmative acts that endangered Joe R. in particular, Defendants'
motion for summary judgment on Plaintiffs' § 1983 state-created danger,
substantive due process claim against Ms. Williams (Count IV) is DENIED.

As Plaintiffs have created a fact issue regarding whether Ms. Williams acted
in violation of Joe R.'s substantive due process right to bodily integrity, the Court
will now consider whether there also exist issues of fact for trial with respect to
Plaintiffs' § 1983 supervisory liability claims against Superintendent Matthews,
Principal Schriner, and Assistant Principal Comb, and Plaintiffs' municipal
liability claim against NCSD. (Count IV).

To establish supervisory liability, a § 1983 plaintiff must, at minimum,
show that a supervisor knowingly acquiesced in unconstitutional conduct; as part
of this inquiry, a court must consider whether an official's "execution of his or her
job function" caused plaintiff's injury. *Peatross v. City of Memphis*, 818 F.3d 233,
241 (6th Cir. 2016). As a second part of the inquiry in a § 1983 supervisory liability
claim, a court must also consider whether there is a causal connection between the
defendant's wrongful conduct and the violation alleged. *Id.* at 242. *Peatross* and
*Coley v. Lucas Cty.*, 799 F. 3d 530 (6th Cir. 2015) illustrate conduct that the Sixth
Circuit has considered "knowing acquiescence." In *Coley*, the Court found that
plaintiff stated a claim for § 1983 supervisory liability under a knowing
acquiescence theory against a sheriff where one of the officers supervised by the
sheriff used excessive force against plaintiff and the sheriff allegedly: (1) failed to
train his staff regarding the use of excessive force (2) failed to properly investigate

33

plaintiffs' allegations of the officer's use of excessive force and (3) made false statements to officials regarding the incident. *Coley*, 799 F. 3d at 541-42. Similarly, in *Peatross*, the court found that a supervising officer knowingly acquiesced in the unconstitutional conduct of one of his subordinates where a subordinate used excessive force against plaintiff and the supervisor allegedly: (1) failed to train his charges in the use of excessive force (2) failed to properly investigate plaintiff's allegations and (3) attempted to cover-up the unconstitutional conduct of his subordinates by exonerating the officers. *Peatross,* 818 F.3d at 242-43.

Here, Plaintiffs have presented sufficient evidence to create a genuine issue of material fact as to whether Principal Schriner knowingly acquiesced in Ms. Williams's violation of Joe R.'s Constitutional right to bodily integrity. As Principal Schriner testified, NMS had no transition system for students who the district considered to present behavioral issues; indeed, according to Mr. Comb, it was NMS policy to eschew examining its students' behavioral records. Moreover, as Principal Schriner further stated, NMS, in contravention of the Department of Education's 2011 Dear Colleague letter, had not offered its faculty any training for how to detect or respond to sexual harassment. In addition, Principal Schriner admits that on March 7, 2013, she, along with other NMS administrators including Superintendent Matthews, received an email from C.R. and J.R. alleging, among other things, that Joe R. had been subject to sexual abuse by a peer on a daily basis in a separate room during math class. (Dkt. 79, Ex. 2 at 152; Ex. 37). Upon receiving this letter, Superintendent Matthews asked Principal Schriner to "help

him understand the context." (*Id.* Ex. 38). Despite already having viewed J.P.'s video and learning of the report J.R. and C.R. filed with the Novi Police Department, Principal Schriner's investigation of the allegations consisted of having a single conversation with Ms. Williams "about the opportunity for students to be alone" in the separate room, which Ms. Williams states never occurred. (*Id.* Ex. 2 at 41-42). Then, after speaking with Ms. Williams, Principal Schriner pressured C.R. and J.R. to return their son to school, including all of his classes with J.J., according to her view that the boys' behavior was "mutual" and Joe R. was therefore in no danger. Principal Schriner's conduct arguably falls within the pattern of supervisory behavior that the Sixth Circuit considered knowing acquiescence in *Peatross* and *Coley*: that is, she failed to train and supervise her employees with respect to sexual harassment and when she learned of allegations of J.J. harassing Joe R. in a separate room that Ms. Williams placed them in she conducted a perfunctory investigation and took acts such as failing to retain video that could be considered an attempt to suppress evidence.  She also took a defensive posture seemingly to prevent any suggestion of impropriety, including by advancing the view that the boys' behavior was mutual and insisting to J.R. and

C.R. that Joe R. return to NMS and all his classes with J.J.[22]  A reasonable jury could therefore conclude that Principal Schriner knowingly acquiesced in Ms. Williams's decision to repeatedly place, or allow, J.J. and Joe R. to spend time together in a separate room where J.J. allegedly sexually harassed Joe R. a number of times.

Additionally, a reasonable jury could certainly find that there is a causal link between Principal Schriner's acts and omissions and Joe R.'s injury, because failing to have a transition system for troubled students, failing to check students' behavioral records, and failing to offer teachers sexual harassment training, could clearly increase the likelihood that a teacher might place a student with a history of peer aggression alone in a separate room with a student with a history of vulnerability, whom she had previously seen touching one another inappropriately. *Peatross*, 818 F.3d at 244 (citing *Campbell v. City of Springboro*, 700 F.3d 779 (6th Cir. 2012)).

---

[22] Indeed, at her deposition, Principal Schriner was equivocal as to whether she was even aware of the math class allegations. *See* Dkt 79, Ex. 2 at 38-41:

"Q: So to your knowledge, none of the students in the math class, other than Joe/JJ, were interviewed; correct?
A: I don't know what math class you are talking about.
Q: So we are talking about Ms. Williams's special education math class that involves Joe R./JJ
A: I don't have anything related or regarding a math class […]
Q: Are you unaware that the Plaintiffs and Joe R. allege that JJ/Joe R. were placed in the math office, and that there were numerous sexual touching incidents in the math office?
A: I am aware of that only based on being interviewed by the police.
Q: You were never in any other way put on notice of that allegation?
A: From the specifics in the [March 7th] e-mail, when C.R./J.R. state that thing happened in class, they talked about math. When we spoke to Ms. Williams about allegations along that line, she stated that they were not alone in the math class, in that math lab room.

Accordingly, because a reasonable jury could find that Principal Schriner knowingly acquiesced in Ms. Williams placing J.J. and Joe R. in the separate room, and that this knowing acquiescence had a causal relationship to Joe R.'s injury, the Individual Novi Defendants' motion for summary judgment as to Principal Schriner's supervisory liability under § 1983 as alleged in Count IV is DENIED.

The next issue for the Court to consider is whether there is a genuine issue of material fact as to whether NCSD is liable as a municipality for failing to train its staff members on sexual abuse issues. To succeed against a municipality on a failure to train claim, a plaintiff must demonstrate: "(1) that a training program is inadequate to the tasks that the [teachers] must perform; (2) that the inadequacy is the result of the [municipality's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury." *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016).

With respect to the first element, the evidence is sufficient to raise a genuine issue of fact; Superintendent Matthews admits that he had never promulgated any guidelines concerning sexual harassment and Principal Schriner admits that NMS never offered its teachers any training on the subject. The facts thus support Plaintiffs' claim that NCSD's training on sexual harassment issues was inadequate.

As to the second element, inadequate training can be found to be the result of deliberate indifference where there is a "failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction." *Id.*

37

(quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)). In 2011, NCSD received the Department of Education's Dear Colleague letter, outlining the prevalence of sexual harassment in schools and making recommendations regarding how to proactively train staff to prevent and respond to it. (Dkt. 79, Ex.4). Peer-on-peer sexual harassment is clearly a foreseeable consequence of failing to provide teachers training on sexual harassment. Consequently, the inadequacy of NCSD's training could be said to be the result of the district's deliberate indifference because this harmful foreseeable consequence could result from a lack of instruction.

As to the third prong, that is, whether NCSD's inadequate training is closely related to Joe R.'s injuries, a genuine issue of fact has been raised. Certainly, a jury would be within the bounds of reason in deciding that, had Ms. Williams been properly trained in recognizing and responding to signs of sexual harassment, she would have substantively intervened when she first saw the boys touching in September 2013 and decided against placing J.J. and Joe R. in a separate room with one another.

Accordingly, because Plaintiffs have produced sufficient evidence to raise a genuine issue of fact as to whether NCSD was deliberately indifferent in failing to offer its teachers any training on sexual harassment, and that Joe R.'s injuries were closely related to this failure to train, NCSD's motion for summary judgment on Plaintiffs' § 1983 municipal liability claim as alleged in Count IV is DENIED.

The last issue for the Court to address with respect to Plaintiffs' § 1983 claims is Plaintiffs' motion for summary judgment on their failure to train claim against NCSD. (Dkt. 79 at 43-47). To succeed against a municipality on a § 1983 failure to train claim, a plaintiff must first prove that there was an underlying constitutional violation. *Stiles ex rel. D.S. v. Grainger County, Tenn.*, 819 F.3d 834, 856 (6th Cir. 2016).[23] Although the evidence does raise a genuine issue of material fact as to whether Ms. Williams violated Joe R.'s Fourteenth Amendment right to substantive due process, this claim has not been proven. Because the underlying constitutional violation on which Plaintiffs base their § 1983 failure to train claim against NCSD has not been proven, Plaintiffs' motion for summary judgment on Count III is DENIED.

### C.   NCSD's Motion for Summary Judgment on Plaintiffs' § 504/ADA Claims (Count V)

The next issue for the Court to address is whether NCSD is entitled to summary judgment on Plaintiffs' claims against it for disability discrimination under § 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990, 42 U.S.C. 12101, *et seq.* (Count V). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be

---

[23] Plaintiffs cite to two unpublished, district court cases from other jurisdictions where the Court awarded judgment to Plaintiffs on § 1983 failure to train claims against a school district without specifically awarding judgment on the underlying constitutional violation. *Doe v. Forest Hills Sch. Dist.,* 2015 U.S. Dist. Lexis 175321 (W.D. Mich) (Dkt. 79, Ex. 60); *Belcher v. Robertson Cty.,* 2014 U.S. Dist. Lexis 165238 (M.D. Tenn) (Dkt. 79, Ex. 61).  In *Forest Hills*, however, the perpetrator had already plead guilty to Plaintiff's allegations in the related criminal case and *Belcher* was a bench trial. *Forest Hills* and *Belcher* are therefore inapposite.

excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly provides, "no otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Other than § 504's "limitation to denials of benefits 'solely' by reasons of disability and its reach of only federal funded entities, the reach and requirements of both statutes are precisely the same." *S.S. v. Eastern Kentucky*, 532 F.3d 445, 452-53 (6th Cir. 2008). If neither of these differences are at issue in a given case, courts analyze ADA and § 504 claims together. *Id.* at 453 (citing *Thompson v. Williamson County*, 219 F.3d 555, 557 n.3 (6th Cir. 2000); *Maddox v. Univ of Tenn.*, 62 F.3d 843, 846 n.2 (6th Cir. 1995)). Here, Plaintiffs present their ADA and § 504 claims together, with identical elements. (Dkt. 87 at 81-83). The Court will thus analyze them as one.

A plaintiff can establish a disability claim under the ADA and § 504 in one of two ways. First, a plaintiff can establish (1) that he is disabled under the statute, (2) otherwise qualified for participation in an educational program, and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the education program by reason of his disability. *S.S. v. Eastern Kentucky,* 532 F.3d at 453 (citing *Maddox* 62 F.3d 843). Second, a claimant may seek to satisfy the *Davis* test used in cases of peer-to-peer sexual

harassment[24]—*i.e.* that plaintiff is (1) a disabled individual, who was (2) subject to severe and pervasive harassment based on that disability, and (3) the educational institution was aware of and deliberately indifferent to the harassment. *Id.* at 454.

Plaintiffs argue that NCSD is liable under both tests. With respect to the first, it is uncontested that Joe R. is a disabled individual and that he is qualified for NMS's educational program. The critical issue is thus whether NMS excluded him from participation in or denied him the benefits of their educational program based on his disability. Plaintiffs argue that Joe R. was denied the benefits of NMS's educational program and discriminated against on the basis of his disability when (1) Ms. Williams repeatedly placed him in a separate room, (2) Principal Schriner and Mr. Comb suspended him, (3) Mr. Comb interviewed Joe. R. after the incident with no awareness of his impairments, and (4) Principal Schriner told J.R. and C.R. that Joe R. was "no different than any middle school student" and that his disability provided no reason to contact his parents about prior hand-holding and improper touching incidents. (Dkt 87 at 81-82). Plaintiffs fail to present any evidence, however, indicating that these decisions and statements were made because of Joe R.'s disability of autism. In other words, Plaintiffs have not demonstrated that Ms. Williams, Mr. Comb, or Principal Schriner would have made different decisions had they been dealing with a similarly situated, non-disabled student.

---

[24] *See* discussion *supra* Part I.A.

With respect to Plaintiffs' argument that NCSD is liable for disability discrimination under the *Davis* peer-on-peer harassment framework, Plaintiffs also fail to present evidence sufficient to create an issue of fact for trial: they have not presented facts that would enable a jury to conclude that J.J. subjected Joe R. to harassment because of his disability. Plaintiffs have presented evidence indicating that J.J. subjected Joe R. to a disturbing series of domineering physical advances, but nothing in the record indicates that J.J.—who has a history of indiscriminately harassing many of his peers—knew that Joe R. was disabled, let alone targeted him because of it.

Accordingly, because Plaintiffs have failed to present evidence that any of Joe R.'s teachers or J.J. acted in a discriminatory fashion toward Joe R. because of his disability, Plaintiffs' claims against NCSD for disability discrimination must fail. NCSD's motion for summary judgment on Plaintiffs' ADA/§504 claims under Count V is therefore GRANTED.

### D. The Individual Novi Defendants', and NCSD's, Motions for Summary Judgment on Plaintiffs' Michigan ELCRA Claims (Count VI)

Plaintiffs bring claims alleging that the Individual Novi Defendants and NCSD created a hostile sexual environment in violation of the Michigan Elliot-Larsen Civil Rights Act (ELCRA). M.C.L. § 37.2402(a). (Count VI). (Dkt. 12 at 38-39). The Individual Novi Defendants and NCSD move for summary judgment on these claims. To establish a prima facie cause of action for creating a hostile sexual environment under the Michigan ELCRA, a plaintiff must demonstrate that: (1) he

belonged to a protected group, (2) he was subjected to communication or conduct on the basis of sex, (3) he was subject to unwelcome sexual conduct or communication, and (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with his education or employment or create an intimidating, hostile, or offensive educational or work environment. *Radtke v. Everett*, 442 Mich. 368 (1993).

While the Michigan Supreme Court has not ruled on the issue of whether same-gender harassment is actionable under ELCRA, the Michigan Court of Appeals has. To establish a hostile-environment claim based on same-gender harassment, a plaintiff must present evidence showing that the harasser's conduct constituted discrimination because of sex. Evidentiary routes that allow male Plaintiffs to establish hostile-environment claims based on same-sex harassment include: (1) showing that the harasser was making advances out of sexual desire, (2) showing that the harasser was motivated by a general hostility towards the gender of plaintiff, and (3) offering direct comparative evidence about how the alleged harasser treated members of both sexes. *Robinson v. Ford Motor* Co., 277 Mich. App. 146 (2007) (quoting *Onacle v. Sundower Offshore Services, Inc.,* 523 U.S. 75, 80-81 (1998)), *cited with approval in Wask v. Arrow Energy Services, Inc.,* 682 F.3d 463 (6th Cir. 2012).

In reviewing the record, the Court can find no evidence that J.J.'s harassment of Joe R. was on the basis of sex; Plaintiffs do not allege that J.J. was acting out of homosexual desire—to the contrary, Plaintiffs vehemently contend

that no element of amorousness should be read into the boys' interactions; Plaintiffs do not indicate that J.J. had a general hostility towards men; and provide no comparative evidence regarding how J.J. treated female students (nothing in J.J.'s behavioral record indicates that his prior acts of invading peers' physical space were specifically directed at males). Because Plaintiffs have not presented sufficient evidence to create a factual issue as to whether J.J.'s conduct was directed toward Joe. R on the basis of sex, Plaintiffs' ELCRA claims against the Individual Novi Defendants and NCSD must fail and the Individual Novi Defendants' and NCSD's motions for summary judgment on Count VI are GRANTED.

### E.   The Individual Novi Defendants', and NCSD's, Motions for Summary Judgment on Plaintiffs' Michigan PWDCRA Claims (Count VII)

Plaintiffs bring claims against the Individual Novi Defendants and NCSD under the Michigan Persons with Disabilities Civil Rights Act (PWDCRA) (Count VII). (Dkt. 12 at 39-40). To succeed on a disability discrimination claim under the PWDCRA, a plaintiff must establish that (1) he is a person with a disability within the meaning of the statute, (2) he is qualified for the educational opportunity he seeks despite his disability, and (3) in spite of these qualifications, he has not been given an equal opportunity to secure a similar education as other persons. *Fernandez v. Univ. of Michigan Bd. of Regents*, 2007 WL 3357348, at *6 (Mich. Ct. App. 2007) (citing *Peden v. Detroit*, 470 Mich. 195, 204 (2004); *Crancer v. Board of Regents*, 156 Mich. App 790, 795 (1986)). Assuming that Joe R. qualifies as disabled

44

within the meaning of the statute, and that he is qualified for a public, middle school education, the critical question is whether NMS denied him an equal opportunity to secure an education similar to that made available to other persons. Plaintiffs provide no evidence that the Individual Novi Defendants or NCSD either "directly discriminated" against Joe R. *because* of his disability, or "failed to accommodate" his disability. *Penden*, 470 Mich. at 205. Plaintiffs argue that when Ms. Williams placed Joe R. in the separate room, she denied him an equal opportunity to secure a similar education as other persons; but Plaintiffs fail to show how or whether this action specifically denied Joe R. an equal opportunity to a middle school education or how Ms. Williams's actions constitute direct discrimination against Joe R. because of his disability or a failure to accommodate his disability. Plaintiffs' PWDCRA claims against the Individual Novi Defendants and NCSD must therefore fail and the Individual Novi Defendants' and NCSD's motions for summary judgment on Count VII are GRANTED.[25]

### F.   The Individual Novi Defendants' Motion for Summary Judgment on Plaintiffs' Claim for Intentional Infliction of Emotional Distress (Count VIII)

Against the Individual Novi Defendants, Plaintiffs bring a Michigan common law claim for Intentional Infliction of Emotional Distress (IIED). (Count VIII). (Dkt. 12 at 40-42). In order to succeed on an IIED claim, a plaintiff must show (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4)

---

[25] Because the Defendants' motions for summary judgment were granted on other grounds, the Court need not reach NCSD's argument that Plaintiffs' PWDCRA claim is preempted by the Michigan Mandatory Special Education Act (MMSEA).

severe emotional distress. *Lewis v. Le Grow,* 258, Mich. App. 175, 196 (2003). Liability will attach only where "a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Graham v. Ford*, 237 Mich. App. 670, 674. The Michigan Supreme Court has described the test as whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Roberts v. Auto-Owners Ins. Co.* 422 Mich. 594, 603 (1985).[26]

Plaintiffs argue that Superintendent Matthews, Principal Schriner, Mr. Comb, and social worker Colone are all liable for intentionally inflicting emotional distress on Joe R.'s parents, J.R. and C.R. Regarding Superintendent Matthews and Ms. Colone, Plaintiffs can point only to various statements that each made and that are allegedly misleading or false. (Dkt. 87 at 86). No reasonable jury could conclude that these statements of themselves rise to the level of extreme and outrageous conduct. With respect to Principal Schriner and Mr. Comb, however, Plaintiffs offer much more evidence.  Viewing this evidence in Plaintiffs' favor, it is

---

[26] For examples of cases discussing the kinds of conduct that could be considered IIED, *compare Estate of Roush ex rel. Hardy v. Laurels of Carson City, L.L.C.*, 2014 WL 7004021, at *3 (Mich. Ct. App. 2014) (genuine issue of material fact as to plaintiff's IIED claim where woman alleged she was illegally detained and refused treatment at a rehabilitation center); *Bhama v. Bhama*, 169 Mich. App. 73 (1988) (genuine issue of material fact where divorced psychiatrist used his professional skill set to turn his children against ex-wife), *with Cassise v. Walled Lake Consol. Schools*, 2006 WL 445960 (Mich. Ct. App. 2006) (no genuine issue of material fact where high school officials publicly revealed personal information about a student athlete).

not unreasonable to conclude that upon seeing it a juror might well cry "outrageous!" As discussed earlier within the context of Plaintiffs' § 1983 failure to train claim,[27] after discovering J.P's video of J.J. touching Joe R., Principal Schriner and Mr. Comb encouraged J.P. to delete the video; subsequently, they worked together to explain the boys' behavior by establishing a theory of mutuality and, despite knowing of the ongoing Novi Police investigation, Principal Schriner deleted the video footage of the boys entering a bathroom together. Finally, again viewing the evidence in the light most favorable to Plaintiffs, Principal Schriner and Mr. Comb decided to suspend Joe R. and advised C.R. and J.R. that their autistic son, who had recently communicated to them that he had been chronically sexually abused, should return to school, where he would immediately be placed back into classes with his alleged abuser, because he was in no danger. Reasonable minds could differ as to whether this conduct goes beyond all possible bounds of decency, but the evidence is sufficient to raise the question.

Having established that there is a fact question on this issue of whether Principal Schriner and Mr. Comb engaged in extreme and outrageous conduct against C.R. and J.R., the Court must now determine whether they were at least reckless in doing so and whether this conduct caused Joe R.'s parents severe emotional distress. While there is no evidence indicating that Principal Schriner and Mr. Comb intended to cause C.R. and J.R. emotional distress, a reasonable jury could conclude that destroying evidence, crafting an explanatory theory of

---

[27] *See supra* Part III.B.

romantic mutuality in response to allegations of sexual misconduct between two developmentally disabled students, and then mandating that C.R. and J.R. return their son to the same situation where the abuse occurred was reckless conduct for a principal and assistant principal. And, given the fact that Principal Schriner and Mr. Comb actually communicated to C.R. and J.R. that Joe. R was in no danger and thus should be returned to class with J.J., a reasonable jury could conclude that Joe. R.'s parents experienced severe distress both from the fact that their concerns were dismissed and that they were being required to expose their child to what they believed to be a known risk of harm.[28] C.R. and J.R. expressed these concerns in response to NMS's handling of Joe R.'s alleged abuse in a March 7, 2014 letter to Superintendent Matthews. (Dkt. 79, Ex. 37). In addition, their distress is corroborated by J.R.'s testimony describing her trauma and a therapist's report of a session with C.R. which memorializes his agonized emotional state. (Dkts. 87, Ex. 23 at 248-49; Ex. 90.). Considering all the evidence, there is a genuine issue of fact as to whether a reasonable juror would find Principal Schriner's and Mr. Comb's conduct outrageous, and whether their conduct was reckless and caused severe emotional distress to J.R. and C.R. Accordingly, the Individual Novi Defendants' motion for summary judgment against Plaintiffs' IIED claims in Count VIII is DENIED as to Principal Schriner and Mr. Comb.

---

[28] Neither bodily harm nor the seeking and receiving of medical treatment are conditions precedent to satisfying the element of extreme emotional distress in an IIED claim. *Warren v. June's Mobile Home Village & Sales*, Inc., 66 Mich. App. 386, 239 (1976); *McCahill v. Commercial Union Ins. Co.*, 179 Mich. App. 761, (1989).

### G.   The Individual Novi Defendants' Motion for Summary Judgment on Plaintiffs' Gross Negligence Claim against Vera Williams (Count IX)

Plaintiffs bring a common law claim for gross negligence against Vera Williams (Count IX), Joe R.'s special education math teacher, and Ms. Williams moves for summary judgment on this claim. (Dkt. 12 at 42; Dkt. 83 at 38-40). Unlike the position Plaintiffs take with respect to their negligence claim against the substitute teacher, Ms. Solomon, *see* discussion *infra* Part IV.A., Plaintiffs concede that Ms. Williams is entitled to qualified immunity under § 691.1407(2) of Michigan's Governmental Liability for Negligence Act, because she was an employee working on behalf of a governmental agency at the time of her alleged negligence. (Dkt. 87 at 88-90). Accordingly, Plaintiffs concede that Ms. Williams cannot be held liable unless her conduct (1) amounts to gross negligence—that is*, conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results[29]–and (2) was the proximate cause of Joe. R's injuries–that is, the one, most immediate cause. (*Id.*); *see* M.C.L. §§ 691.1407(2), (8)(a); *Robinson v. City of Detroit*, 462 Mich. 439, 462 (1999). Regarding § 691.1407(2)'s use of the term "the proximate cause," the Supreme Court of Michigan has interpreted it very strictly; a defendant's gross negligence must be "*the* one most immediate and efficient direct cause of the injury, not '*a* proximate cause.'" *Robinson*, 462 Mich. at 446 (emphasis added) (fleeing suspect's reckless driving, and not police officers'

---

[29] The Michigan Court of Appeals has further characterized § 691.1407(2)'s gross negligence standard as "a willful disregard of safety measures and a singular disregard for substantial risks." *Oliver v. Smith*, 290 Mich. App. 678, 685, 810 N.W.2d 57, 62 (2010) (citing *Tarlea v. Crabtree*, 263 Mich.App. 80, 90, 687 N.W.2d 333 (2004)).

chase, constituted the proximate cause of the injuries suspect suffered in crash); *accord Beals v. Michigan* 497 Mich. 363, 366 (2015) (unknown reason why decedent remained submerged, and not public lifeguard's failure to intervene, was the proximate cause of decedent's death by drowning); *Miller v. Lord*, 262 Mich. App. 640, 643-44 (2004) (male student's actions, and not teachers' decision to leave male and female students unattended, was the proximate cause of sexual assault against female student).

Even viewing the evidence in the light most favorable to Plaintiffs, it does not raise a genuine issue of material fact as to whether Ms. Williams's conduct meets the high standards of gross negligence and proximate cause required to impose liability under M.C.L. § 691.1407(2). Accepting as true the allegation that Ms. Williams repeatedly placed J.J. and Joe R. in a separate room after having seen them inappropriately touch in September 2013, and that this conduct demonstrated a substantial lack of concern for whether Joe R. was injured, the evidence nevertheless does not permit any reasonable inference that Ms. Williams's conduct was the single most immediate cause of Joe R.'s harm.  Rather, the evidence shows that J.J.'s conduct was the single most immediate cause of Joe R.'s harm.  Plaintiffs protest that the strict proximate cause standard the Michigan courts use in interpreting § 691.1407 make it so that a teacher can never be held liable when one students harms another. (Dkt. 88 at 90). Given the clarity of Michigan law on this point, however, this argument is more properly addressed to the Supreme Court of Michigan, or the Michigan legislature. With respect to state

50

claims, this Court is bound by substantive state law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Thus, because no reasonable jury could conclude that Ms. Williams's conduct was *the* one proximate cause of Joe R.'s injury, as it must under M.C.L. § 691.1407(2), Plaintiffs' gross negligence claim against Ms. Williams fails and her motion for summary judgment on Count IX is therefore GRANTED.

## IV. Defendants Jean Solomon and EDUStaff's Motion for Summary Judgment on Counts X and XI (Dkt. 78)

Plaintiffs bring a Michigan common law negligence claim against substitute teacher Jean Solomon (Count X) and a Michigan common law claim for vicarious liability against EDUStaff, the private staffing agency that placed Ms. Solomon at NMS. (Count XI). (Dkt. 12 at 43-44). Plaintiffs argue that Defendant Solomon, while substitute teaching for Ms. Becker's English class on February 26, 2014, was negligent in failing to intervene while J.P. filmed J.J. touching Joe R., and that EDUStaff is liable for her omission. (*Id.*) In response, Defendants Solomon and EDUStaff filed a joint motion for summary judgment. (Dkt. 79). The Court will address Defendant Solomon's arguments first, then EDUStaff's.

### A. Defendant Jean Solomon's Alleged Negligence

As a threshold matter, the Court must determine whether Defendant Solomon is entitled to qualified immunity under Michigan's Governmental Liability for Negligence Act. M.C.L. § 691.1407(2). As discussed above, if Ms. Solomon is covered under the Act, she cannot be held liable unless her conduct (1) amounts to gross negligence and (2) was the proximate cause of Joe. R's injuries.

51

In pertinent part, § 691.1407(2) provides:

(2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:

(a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. *Id.*

It is well settled that public school teachers are eligible for immunity under § 691.1407(2), because public schools are governmental agencies engaged in the discharge of a governmental function and teachers are government employees. *See, e.g., Miller ex rel. Miller v. Lord*, 262 Mich. App. 640, 643, 686 N.W.2d 800, 801 (2004); *Backus v. Kaufman*, 238 Mich. App. 605 N.W.2D 641 (1999). The agreement between EDUStaff and NMS provides, however, that all "Supplied Staff"— including Defendant Solomon—are employees of EDUStaff, not the public schools they work within. (Dkt 85 at 28; Ex. 69 at 2-4; Ex. 73 at 10). This factual circumstance presents a question of first impression; the Court finds no reported Michigan opinion that addresses whether a substitute teacher, working at a public

school but employed and placed at that school by a private staffing agency, is entitled to immunity under § 691.1407(2).

In arguing that Defendant Solomon is not immune from tort liability, Plaintiffs rely on *Vargo v. Sauer*, 457 Mich. 49, 576 N.W.2d 656 (1998), which is the sole opinion from the Supreme Court of Michigan to address whether § 691.1407(2) applies to an individual who is associated with both governmental and private entities at the time of an allegedly negligent act. (Dkt. 85 at 19-22). In *Vargo*, Plaintiff was the estate of Lois Vargo, who died at the privately-owned St. Lawrence Hospital after receiving medical care provided by Defendant Dr. Harold Sauer, a physician and associate professor at Michigan State University (MSU). *Vargo*, 457 Mich. at 53. At the time of his alleged negligent treatment of Ms. Vargo, Dr. Sauer was "on call" at St. Lawrence, pursuant to an agreement between MSU and the hospital, whereby St. Lawrence housed the university's medical residency program and, in exchange, MSU physicians provided services to the hospital's patients on a rotational basis. *Id.*

The question before the *Vargo* Court was whether Dr. Sauer, a professor at a state university (thus, a state employee) treating a private patient at a private hospital, was entitled to immunity as an employee of a governmental agency under § 691.1407(2). Agreeing with the trial court and the Court of Appeals, the Court held that Dr. Sauer was an employee of a governmental agency in his capacity as an MSU professor, but, departing from the lower courts, opined that § 691.1407(2)'s definition of governmental agency "does not include, or remotely contemplate, joint

ventures, partnerships, arrangements between governmental agencies and private entities." *Id.* at 68. Accordingly, the Court remanded the case, holding that there remained an issue of fact for trial as to whether Dr. Sauer was operating as an agent of St. Lawrence–a private entity–at the time of his alleged negligent treatment of Ms. Vargo. *Id.* at 72. If a jury found that he was, the Court concluded, he would not be entitled to immunity under § 691.1407(2), as the statute protects only "employee[s] of a governmental agency…while in the course of employment." *Id.* at 67-68.

Plaintiffs argue that *Vargo* requires a finding that Defendant Solomon cannot claim qualified immunity under Michigan's statute. Defendant Solomon is clearly not immune from tort liability under § 691.1407(2), Plaintiffs contend, because she was undisputedly an employee of EDUStaff—a private entity—at the time she allegedly was negligent in failing to protect Joe R. from being sexually touched by J.J. in Ms. Becker's class on February 26, 2014. (Dkt. 85 at 19-22). For the reasons set forth below, the Court finds that *Vargo's* reasoning does not support this contention. There is no binding precedent in Michigan on the issue of whether a substitute teacher, employed by a private staffing agency but working at a public school at the time of an allegedly negligent act, is entitled to immunity under § 691.1407(2). Considering the facts here, for reasons explained below, the Court concludes that Defendant Solomon falls within the statute's grant of qualified immunity.

Two contrasting, unpublished cases from the Michigan Court of Appeals—which are the only cases that cite to *Vargo* on issues relevant to Defendant Solomon's motion—help to elucidate why *Vargo* is inapposite and Defendant Solomon is entitled to immunity under § 691.1407(2). The first case, *Ryan v. Lamphere Pub. Sch. Sys.,* 2010 WL 934243 (Mich. Ct. App. Mar. 16, 2010), illustrates well the type of factual scenario that *Vargo* controls. In *Ryan*, a child drowned at a practice swim session for the Special Olympics, a private entity, that was held at a public school. *Ryan*, 2010 WL at *1.  The child's estate brought suit against the two public school teachers and a public school student who were overseeing the fatal practice session on behalf of the Special Olympics. *Id.*  The Court agreed with the trial court that the two teachers and student were, respectively, employees of and a volunteer for a governmental agency (*i.e.* the public school) within the meaning of § 691.1407(2).[30]  Citing *Vargo*, however, the Court admonished the trial court for failing to engage in an analysis of whether defendants were "serving…a private entity—"*i.e.* the Special Olympics—at the time they were alleged to have negligently failed to prevent decedent from drowning. As in *Vargo*, the Court remanded the case for a jury to decide this issue. *Id.* at *9.

---

[30] Notably, one of the teachers was, like Defendant Solomon, a substitute teacher. *Id.* at 10. Likewise, in *Parent v. Lapeer Cmty. Sch.,* 2011 WL 2555719, at *2-3 (Mich. Ct. App. June 28, 2011), another unpublished decision from the Michigan Court of Appeals, the Court adopted the trial court's conclusion that a substitute teacher was an employee of a governmental agency for the purposes of § 691.1407(2). It is unclear in *Ryan* and *Parent,* however, whether private staffing agencies placed the substitute teachers at the public schools where they were working at the time of their allegedly negligent acts. These unpublished decisions are thus of little value to this Court in determining whether Defendant Solomon, who was employed and placed at NMS by EDUStaff, can be considered an employee of a governmental agency under § 691.1407(2).

In contrast to *Ryan* and *Vargo*, in *Nguyen v. Prof'l Code Inspections of Michigan, Inc.*, 2004 WL 1586991, (Mich. Ct. App. July 15, 2004), *rev'd in part,* 472 Mich. 885, 695 (2005), the court of appeals held as a matter of law that Defendant was immune from tort liability under § 691.1407(2). *Nguyen*, 2004 WL at *8. In *Nguyen*, Plaintiff sought to build and operate a nail salon in the City of Grandville, Michigan. He sued, among other parties, Defendant Charles Dyk and his employer, Professional Code Inspections of Michigan (PCI), a private entity. *Id.* at *1. PCI contracted with Grandville to assist the City in complying with state and local construction codes, and Grandville appointed Dyk to the municipal position of Building Official. *Id.* Plaintiff claimed that Dyk was negligent in allowing him to begin constructing the nail salon, because halfway through the construction a different Grandville official discovered that the salon violated a zoning ordinance and placed a stop-work order on the project, which resulted in a monetary loss for Plaintiff. *Id.* In his defense, Dyk argued that he was immune from tort liability under § 691.1407(2), because, although then employed by the private entity PCI, when he permitted Plaintiff to begin building the nail salon, he was acting in his capacity as the City of Grandville's Building Official. *Id.* At *8. Citing *Vargo*, Plaintiff countered that an employee of a private entity is *ipso facto* ineligible for immunity under § 691.1407(2). *Id.*

The *Nguyen* Court concluded that *Vargo* did not apply to the issues before the Court, because *Vargo* held only that § 691.1407(2) does not immunize a governmental employee for a negligent act that occurs while that employee is

working on behalf of a private entity, while in *Nguyen*, Dyk was a private employee seeking immunity for an allegedly negligent act committed while he was serving the public. *Id.* at *8. As the Court pointed out, § 691.1407(2) provides that "each *officer* or employee of a governmental agency…is immune from tort liability for an injury to a person or damage to property caused by the *officer* [or] employee… while in the course of employment or *service*." Looking to the statute's plain meaning, with the aid of a dictionary,[31] the Court defined officer as "a person appointed…to some position of responsibility or authority in some organization," and defined service as "the providing…of accommodation and activities required by the public." *Id* at *9. The Court then held that Dyk was immune from tort liability under § 691.1407(2), notwithstanding the fact that he was an employee of PCI, because he was serving in his capacity as Grandville's appointed Building Official when he permitted Plaintiff to begin constructing the nail salon. *Id.*[32]

As unpublished decisions, *Nguyen* and *Ryan* are of limited precedential value. *See* Mich. Ct. R. 7.215(c)(1) ("An unpublished opinion is not precedentially

---

[31] As the *Nguyen* Court noted, in Michigan, if a statute is unambiguous, and does not provide definitions for the words in question, a court must construe the statute according to its plain meaning, and may use a dictionary to do so. *See Sun Valley Foods Co v. Ward*, 460 Mich. 230, 236, 596 N.W.2d 119 (1999); *People v. Stone*, 463, Mich. 558, 563, 621 N.W.2d 702 (2001).

[32] In addition to holding that Dyk was entitled to immunity under § 691.1407(2), the Court held further that he was not grossly negligent as a matter of law and, accordingly, that Plaintiff could not hold PCI vicariously liable, because "vicarious liability is derivative." *Id.* at 11. In light of subsequent controlling Michigan Supreme Court authority, this Court does not follow this part of the *Nguyen* Court's holding.  In denying EDUStaff's motion for summary judgment, this Court concludes that EDUStaff could be held vicariously liable for Defendant Solomon's actions, in accordance with the Michigan Supreme Court's holding in *Al-Shimmari v. Detroit Med. Center*, 731 N.W.2d 29 (Mich. 2007) ("nothing in the nature of vicarious liability requires that a judgment be rendered against the negligent agent.").  *See supra* Part IV.B.

binding under the rule of stare decisis."). However, *Nguyen*'s reasoning is nevertheless persuasive, and the factual scenario it dealt with is on all fours with the present matter. Unlike in *Vargo* and *Ryan*, the issue before this Court is not whether a public employee was serving a private entity when she was negligent, as Plaintiffs allege Ms. Solomon was in failing to intervene as J.P. filmed J.J. touching Joe R. at NMS.  Rather, as in *Nguyen*, the question is whether, at the time of her allegedly negligent acts, Defendant Solomon was fulfilling responsibilities assigned to her by a governmental agency. Stated differently, in *Vargo,* the Court held that a governmental employee is not entitled to claim immunity for acts committed in private endeavors, but in the present case, as it was in *Nguyen*, the question is whether a private employee may claim immunity for acts occurring in the course of her public service. The Court holds that she may. NMS, a governmental agency, appointed Defendant Solomon to the government position of substitute teacher, and she was serving in that capacity at the time she allegedly failed to prevent J.J. from touching Joe R.  Therefore, according to the plain language of § 691.1407(2), Defendant Solomon is immune from tort liability,

because she was acting as an officer of a governmental agency in the course of service at the time of her alleged negligence.[33]

Having held that as a substitute teacher, Defendant Solomon may invoke the grant of qualified immunity under § 691.1407(2), the Court must also address the other factors of the statute. *See* § 691.1407(2)(a)-(c).  There can be no dispute that, as a substitute teacher working for a public middle school, Ms. Solomon meets the first two elements—*i.e.* that she was acting within the scope of her authority while teaching, and that the school district was engaged in the exercise or discharge of a governmental function. § 691.1407(2)(a)-(b).  The last factor however—that her conduct did not amount to gross negligence that was the proximate cause of the injury or damage—requires more careful analysis. *See* § 691.1407(2)(c).

The issue is whether, on the record adduced by the parties, a reasonable jury could conclude that Ms. Solomon's conduct was grossly negligent, and that this gross negligence was the proximate cause of Joe. R's injury. As discussed in the

---

[33] In addition to the fact that § 691.1407(2)'s plain language requires this result, the Court's decision to extend immunity to Defendant Solomon furthers longstanding policy rationales behind governmental immunity, including "ensuring that talented candidates [are] not deterred by the threat of damages from entering public service," *Wyatt v. Cole*, 504 U.S. 158, 168, 112 S. Ct. 1827, 1833, 118 L. Ed. 2d 504 (1992), and "encouraging the vigorous exercise of official authority" *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). Public schools depend on a reliable supply of substitute teachers, professionals who perform the same important governmental function as their permanent colleagues. Common sense counsels that substitute teachers should be treated similarly to full-time teachers when performing their public duties.  Though not heavily litigated, the issue has caused some state courts and legislatures to extend immunity from tort liability to substitute teachers. *See, e.g.,* Tex. Educ. Code Ann. §§ 22.051, 22.0511 (West) (listing "substitute teacher" as among actors who qualify under Texas immunity statute); *Moon v. Trotwood Madison City Sch.,* 2014-Ohio-1110, ¶ 19, 9 N.E.3d 541, 547 (holding that substitute teachers are immune from tort liability under Ohio immunity statute).

59

context of Plaintiffs' gross negligence claims against Ms. Williams (Count IX), *see supra* Part III.G., in order to be liable for gross negligence under § 691.1407(2), a Defendant's conduct must be so reckless as to demonstrate a substantial lack of concern for whether an injury results," and the "one most immediate cause of plaintiff's injury." *Robinson v. City of Detroit*, 462 Mich. 439, 462 (1999). In light of these legal standards, as applied to the facts adduced by the parties, the Court holds that it might be possible for a reasonable jury to find that Defendant Solomon's conduct was grossly negligent, but impossible for a reasonable jury to find that it was the proximate cause of Joe R.'s injury. Viewing the evidence in the light most favorable to Plaintiffs, a task that asks the Court to assume the disputed fact that Defendant Solomon was *even in the room* (which she generally denies but admits for the purposes of this motion only (Dkt. 78 at 21, n.4)), a reasonable jury might conclude that failing to intervene while J.P. filmed J.J. touching Joe. R for four minutes—where these boys were seated directly in front of Ms. Solomon and were the only (or some of the few) students she was charged with overseeing—demonstrated a substantial lack of concern for whether an injury resulted. A jury could reasonably conclude on these facts that only willful disregard would explain a teacher's failure to intervene and stop such behavior. Nevertheless, reasonable minds could not differ as to whether Defendant Solomon's alleged omission was *the* one, most immediate and efficient direct cause of Joe. R's injury—it clearly was not, J.J.'s actions were. Therefore, because Defendant Solomon qualifies for immunity under § 691.1407(2), and because no reasonable

jury could find that her conduct as alleged was *the* proximate cause of Joe. R's injury, her motion for summary judgment on Plaintiffs' negligence claim against Defendant Solomon in Count X must be GRANTED.

Defendant EDUStaff also moves for summary judgment on Plaintiffs' claim in Count XI that the company is vicariously liable for Defendant Solomon's alleged negligence. Under the common-law doctrine of vicarious liability, an employer is liable for negligent acts that employees commit within the scope of their employment. *Rogers v. J.B. Hunt Transp., Inc.*, 466 Mich. 645, 650–51, (2002). Neither party disputes that, at the time of her alleged negligence, Defendant Solomon was an EDUStaff employee acting within the scope of her employment. EDUStaff argues, however, that because Defendant Solomon should be entitled to summary judgment, there is no underlying tort, and the company cannot therefore be held vicariously liable and would be equally entitled to summary judgment as a matter of law. (Dkt. 78 at 33).

EDUStaff's argument is incorrect. As the Supreme Court of Michigan held in *Al-Shimmari v. Detroit Med. Center*, 731 N.W.2d 29 (Mich. 2007), "nothing in the nature of vicarious liability requires that a judgment be rendered against the negligent agent." *Al-Shimmari*, 731 N.W.2d at 36. In other words, in Michigan, it is the employee-tortfeasor's actions, not their liability, that determine whether or not their employer might be held liable for torts they commit while in the course of

61

employment.[34]  Thus, the fact that Defendant Solomon has been granted summary

judgment does not necessarily mean that EDUStaff is off the hook: the Court has

concluded that Defendant Solomon is immune from tort liability under §

691.1407(2), but that conclusion does not foreclose the possibility that a reasonable

jury might find that her conduct was negligent.  And negligence is the claim

Plaintiffs bring against her. (Dkt. 12 at 42). If a reasonable jury could conclude that

Defendant Solomon acted negligently in failing to prevent J.J. from touching Joe

R., then EDUStaff would not be entitled to summary judgment, and Plaintiffs'

claim for vicarious liability against the company would be allowed to proceed.[35] As

the final step in resolving Defendants Solomon and EDUStaff's joint motion for

summary judgment, the Court now turns to this analysis.

To establish a prima facie case of negligence, "a plaintiff must introduce

evidence sufficient to establish that (1) the defendant owed a duty to the plaintiff,

(2) the defendant breached that duty, (3) the defendant's breach was a proximate

---

[34] In some jurisdictions, if the employee is immune from liability, then the employer is also necessarily so, as it is the tortfeasor's liability, not their actions, that is imputed to the employer in a claim for vicarious liability. *See, e.g., Hollis v. City of Brighton*, 885 So. 2d 135 (Ala. 2004)); *see generally* 53 Causes of Action 2d 281, § 21 (2012) ("Defenses available to an employee—immunity"). This is the theory of "derivative" vicarious liability that the Court advanced in *Nguyen*. *See supra* Part IV.A. *Nguyen*, however, was decided by the Michigan Court of Appeals in 2004 and is flatly contradicted on this point by the Michigan Supreme Court's 2007 decision in *Al-Shimmari*.

[35] As EDUStaff correctly notes, *Al-Shimmari* made clear that once there has been an adjudication on the merits on a claim against an employee, the claim cannot continue to be litigated, or be relitigated, to determine whether an employer is vicariously liable. *Al-Shimmari*, 731 N.W.2d at 36. (Dkt.78 at 32).  Contrary to EDUStaff's argument, however, granting Defendant Solomon's motion for summary judgment on the grounds that she was immune from tort liability under § 691.1407(2) is not an adjudication on the merits of Plaintiffs' claim against her. (Dkt. 78 at 33). As stated, Plaintiffs' claim is that Defendant Solomon was negligent, and the Court has not yet addressed whether an issue of fact exists on this claim. (Dkt. 12 at 43).

cause of the plaintiff's injuries, and (4) the plaintiff suffered damages." *Black v. Shafer,* 499 Mich. 950, 950 (2016) (quoting *Latham v. Nat'l Car Rental Sys.,* Inc., 239 Mich.App. 330, 340 (2000)). In the present matter, the question of whether Joe. R suffered damages is not in dispute.

Whether a defendant owes a duty to a plaintiff is a question of law for the court to decide. *Beaty* v. *Hertzberg & Golden*, *PC*, 456 Mich. 247, 262 (1997). Defendants Solomon and EDUStaff concede, as a general matter, that Defendant Solomon, as Joe R.'s teacher, owed him a duty of reasonable care, which means the level of care that a reasonably careful person would use under the circumstances. *Thompson v. Rochester Cmty. Sch.,* 2006 WL 3040137, at *10 (Mich. Ct. App. Oct. 26, 2006) (citing *Gaincott v. Davis,* 281 Mich. 515, 519 (1937); *Cook v. Bennett,* 94 Mich. App. 93, 98 (1980)).

Defendants point out, however, that in Michigan, "there is no duty to protect against the criminal acts of a third person," as criminal acts are inherently unforeseeable. (Dkt. 78 at 21-25) (citing *Brown v. Brown,* 739 N.W.2d 313 (Mich. 2007); *Smith v. Bronson Lifestyle Improvement and Research Center Co.,* 2015 WL 8932816 (Mich. Ct. App. 2015); *Babula v. Robertson,* 536 N.W.2d 834, 837 (Mich. Ct. App. 1995)).[36] Thus, Defendants contend, because J.J.'s sexual contacts against

---

[36] As discussed later in this Part with respect to proximate cause, to succeed on a negligence claim a plaintiff must, among other things, prove that his injury was a foreseeable consequence of a defendant's conduct. Because Michigan courts consider criminal acts inherently unforeseeable, no injury can be a foreseeable consequence of failing to prevent a criminal act, as it is a logical contradiction to say that there are foreseeable consequences for failing to prevent what one cannot foresee. As such, Michigan courts have ruled that defendants simply have no duty to prevent third party criminal acts.

Joe R. were "criminal," Defendant Solomon had no duty to protect Joe R. from them. If it were clear as a matter of law that J.J.'s behavior included all of the elements necessary to be recognized as a criminal offense, Defendants' foreseeability argument would be persuasive.  But here, the Oakland County Prosecutor's decision to decline charges against J.J. casts considerable doubt on whether J.J.'s conduct met the definition of criminal sexual conduct. Moreover, in the three cases Defendants cite in support of the proposition that defendants do not owe plaintiffs a duty to prevent criminal acts of third parties, the courts held that an employer had no duty to prevent an employee from raping another employee, a babysitter had no duty to prevent her husband from secretly molesting the child she was caring for, and a summer camp had no duty to prevent a counselor from secretly molesting a camper. (*Brown*, 739 N.W.2d 313; *Babula*, 536 N.W.2d 834; *Smith*, 2015 WL 8932816). Rape and child molestation are obviously criminal acts. The conduct at issue here—one middle school boy rubbing his hand on the crotch of another boy over his clothing, while clearly inappropriate and abusive—is much less clear-cut as a crime; it is much more akin to a tort.  On the record before the Court, there is insufficient evidence to permit the conclusion that J.J.'s behavior constituted a crime and therefore could not have been foreseeable.  Consequently, the Court rejects Defendants' argument, and holds as a matter of law that Defendant Solomon, as Joe R.'s teacher, owed him a duty of reasonable care.

Because Defendant Solomon owed Joe R. a duty of care, the next question is if there are any genuine issues of material fact as to whether Defendant Solomon

breached this duty. The answer to this question is yes; the evidentiary record on this issue is replete with questions of fact for trial. Before it can be determined whether or not Defendant Solomon acted as a reasonably careful person would have under the circumstances, a jury would need to determine several factual questions, for example: was Defendant Solomon even present in Ms. Becker's room when J.P. used his cell phone to record J.J. touching Joe R.?  If so, where was she was in relation to them? Did she have an unobstructed view of the boys and of what they were doing? How exactly was J.P. positioned while recording J.J. touching Joe R, and would such a position have caused a reasonable teacher to take notice and intervene? For how long did the touching go on? How many students in total were present in the classroom, and what instruction or other activity was taking place at the time? All of these questions would bear on whether Ms. Solomon breached a duty of reasonable care in failing to discover or prevent the touching conduct. Depending on how these questions are answered, a reasonable jury could go either way.  It is therefore clear that a number of genuine issues of material fact exist as to whether Defendant Solomon breached the duty of care she owed to Joe. R.

  Having established that Defendant Solomon owed Joe. R a duty of care, and that there is a jury question as to whether Defendant Solomon breached this duty, the Court must assess whether there is a genuine issue of fact on the question of whether Defendant Solomon's failure to intervene was a proximate cause of Joe. R's injury. In Michigan, it is well-settled that "in order to be a proximate cause, the negligent conduct must have been a cause of the plaintiff's injury and the plaintiff's

injury must have been a natural and probable result of the negligent conduct."

*O'Neal v. St. John Hosp. & Med.* Ctr., 487 Mich. 485, 496 (2010). In other words, to

be a proximate cause, negligent conduct must be a 'but-for' cause of an injury and

the injury must have been a foreseeable consequence of the conduct. *Id.*

      Here, taking Plaintiffs' version of events as true, it is clear that a reasonable

jury could find that but for Defendant Solomon's negligence, J.J. would not have

been capable of touching Joe. R for four minutes while being recorded on J.P.'s cell

phone. If Defendant Solomon had seen the boys engaged in this behavior, the

exercise of reasonable care would have meant intervening to stop the conduct. In

addition, a reasonable jury could certainly conclude that inappropriate touching

and improper use of a cell phone by middle school students during class are natural

and probable consequences of a teacher's failure to properly manage and supervise

the class. Here too, the question of whether Defendant Solomon's alleged

negligence was a proximate cause of Joe R.'s injuries is a question of fact for the

jury to resolve.

      To summarize, assuming Defendant Solomon was in the room when J.J. was

inappropriately touching Joe R. and being recorded by J.P., the Court holds that

Defendant Solomon owed Joe. R a duty of reasonable care, and that there are

genuine issues of material fact as to whether she breached this duty, and whether

this breach was a proximate cause of Joe. R's injuries. Consequently, because a

reasonable jury could hold EDUStaff vicariously liable for the negligence of its

employee if it were to find that Defendant Solomon was negligent, EDUStaff's

motion for summary judgment on Count XI must be DENIED, and Plaintiffs' negligence claim against Defendant Solomon must be allowed to proceed, for the purpose of determining EDUStaff's liability.

## VI.    Summary

The Court has reached the following dispositions on the four cross-motions for summary judgment before it. The summary of the Court's dispositions below is organized according to the order that Plaintiffs present their claims in their Amended Complaint and followed by a list of Plaintiffs' claims that will proceed to trial.

Count I: Title IX Sexual Harassment against NCSD

- NCSD's motion for summary judgment (Dkt. 84) is DENIED.

- Plaintiffs' motion for summary judgment (Dkt. 79) is DENIED.

Count II: Title IX Retaliation against NCSD

- NCSD's motion for summary judgment (Dkt. 84) is DENIED.

Count III: § 1983 Municipal Liability against NCSD

- NCSD's motion for summary judgment (Dkt. 84) is DENIED.

- Plaintiffs' motion for summary judgment (Dkt, 79) is DENIED.

Count IV: § 1983 against the Individual Novi Defendants

- The Individual Novi Defendants' motion for summary judgment (Dkt. 83) is GRANTED with respect to Plaintiffs' equal protection claim, DENIED with respect to Plaintiffs' substantive due process

claim on a state-created danger theory as against Vera Williams, and DENIED with respect to Plaintiffs' supervisory liability claim as against Principal Schriner.

Count V: § 504/ADA against NCSD

- NCSD's motion for summary judgment (Dkt. 84) is GRANTED.

Count VI: Michigan ELCRA against NCSD and the Individual Novi Defendants

- NCSD's motion for summary judgment (Dkt. 84) is GRANTED.

- The Individual Novi Defendants' motion for summary judgment (Dkt. 83) is GRANTED.

Count VII: Michigan PWDCRA against NCSD and the Individual Novi Defendants

- NCSD's motion for summary judgment (Dkt. 84) is GRANTED.

- The Individual Novi Defendants' motion for summary judgment (Dkt. 83) is GRANTED.

Count VIII: Intentional Infliction of Emotional Distress against the Individual Novi Defendants:

- The Individual Novi Defendants' motion for summary judgment (Dkt. 83) is DENIED as against Principal Schriner and Mr. Comb.

Count IX: Gross Negligence against Vera Williams

- The Individual Novi Defendants' motion for summary judgment (Dkt. 83) is GRANTED.

Count X: Negligence against Jean Solomon

- Jean Solomon's motion for summary judgment (Dkt. 78) is GRANTED.

Count XI: Respondeat Superior against EDUStaff

- EDUStaff's motion for summary judgment (Dkt. 78) is DENIED.

Accordingly, the following seven of Plaintiffs' claims survive the various Defendants' motions for summary judgment and shall proceed to trial:

1. Plaintiffs' Title IX claim against NCSD for peer-on-peer sexual harassment (Count I);

2. Plaintiffs' Title IX claim against NCSD for retaliation (Count II);

3. Plaintiffs' § 1983 municipal liability claim against NCSD based on its failure to train (Count III);

4. Plaintiffs' § 1983 substantive due process claim against Vera Williams based on a state-created danger theory (Count IV);

5. Plaintiffs' § 1983 supervisory liability claim as against Principal Schriner (Count IV);

6. Plaintiffs' Michigan common law claim of Intentional Infliction of Emotional Distress as against Principal Schriner and Mr. Comb (Count VIII); and

7. Plaintiffs' Michigan common law claim of Respondeat Superior against EDUStaff based on Jean Solomon's alleged negligence (Count XI).

## VII.   Conclusion

For the reasons stated above, Novi Community School District's motion for summary judgment (Dkt. 84) is **GRANTED IN PART AND DENIED IN PART,** Andrew Comb, Steven Matthews, Stephanie Schriner and Vera Williams's motion for summary judgment (Dkt. 83) is **GRANTED IN PART AND DENIED IN PART,** Plaintiffs' motion for summary judgment (Dkt. 79) is **DENIED,** and Jean Solomon and EDUStaff's motion for summary judgment (Dkt. 78) is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED**.

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  February 9, 2017

### Certificate of Service

I hereby certify that this Order was electronically submitted on February 9, 2017, using the CM/ECF system, which will send notification to each party.

By:  s/A. Chubb
Case Manager

70